This Opinion is a
Precedent of the TTAB

Hearing: June 27, 2019                                    Mailed: August 5, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*International Dairy Foods Association*

*v.*

*Interprofession du Gruyère and Syndicat
Interprofessionnel du Gruyère*
_____

*U.S. Dairy Export Council*
*v.*
*Interprofession du Gruyère and Syndicat
Interprofessionnel du Gruyère*
_____

*Atalanta Corporation*
*v.*
*Interprofession du Gruyère and Syndicat
Interprofessionnel du Gruyère*
_____

*Intercibus Inc.*
*v.*
*Interprofession du Gruyère and Syndicat
Interprofessionnel du Gruyère*
_____

Opposition Nos. 91232427, 91232442, 91232446
and 91232448, respectively.[1]

---

[1] The Board consolidated these opposition proceedings in its order dated February 6, 2017. 4 TTABVUE (Opposition No. 91232427). Citations in this opinion are to the record in Opposition No. 91232427 (unless otherwise noted) and to the TTABVUE docket entry number and the electronic page number where the document or testimony appears. Because the

_____

Brian G. Gilpin and Zachary R. Willenbrink of Godfrey & Kahn, S.C.
    for International Dairy Foods Association, United States Dairy
    Export Council, Atalanta Corporation, and Intercibus Incorporated.

Richard Lehv, Susan Upton Douglass and Sean Harb of Fross Zelnick
    Lehrman & Zissu, P.C., for Interprofession du Gruyère and
    Syndicat Interprofessionnel du Gruyère.

_____

Before Zervas, Greenbaum and Larkin,
    Administrative Trademark Judges.

Opinion by Zervas, Administrative Trademark Judge:

On September 17, 2015, Interprofession du Gruyère ("IDG"), a Swiss registered

association, and Syndicat Interprofessionnel du Gruyère ("SIG"), a French syndicat

interprofessionnel, (collectively, "Applicants") filed an application for registration of

Board primarily uses TTABVUE in reviewing evidence, the Board prefers that citations to non-confidential parts of the record include the TTABVUE docket entry number and the TTABVUE page number. For material or testimony that has been designated confidential and which does not appear on TTABVUE, the TTABVUE docket entry number where such material or testimony is located should be included in any citation. *See Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

the standard character certification mark[2] GRUYERE on the Principal Register[3] for "cheese," based on use in commerce under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), claiming first use at least as early as 1982 and first use in commerce at least as early as 1985. The application includes the following statements:

> The certification mark, as used by persons authorized by the certifier, certifies that the cheese originates in the Gruyère region of Switzerland and France.
>
> 1). In Switzerland this region includes the cantons of Fribourg, Vaud, Neuchatel, Jura, and the districts of Courtelary, La Neuveville, Moutier as well as the communes of Ferenbalm, Guggisberg, Mühleberg,

---

[2] Section 45 of the Act, 15 U.S.C. § 1127, defines a "certification mark" as:

> [A]ny word, name, symbol, or device, or any combination thereof-
>
> (1) used by a person other than its owner, …
>
> to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

Section 4 of the Trademark Act, 15 U.S.C. § 1054, provides:

> Subject to the provisions relating to the registration of trademarks, so far as they are applicable, collective and certification marks, including indications of regional origin, shall be registrable under this chapter, in the same manner and with the same effect as are trademarks, by persons, and nations, States, municipalities, and the like, exercising legitimate control over the use of the marks sought to be registered, even though not possessing an industrial or commercial establishment, and when registered they shall be entitled to the protection provided in this chapter in the case of trademarks, except in the case of certification marks when used so as to represent falsely that the owner or a user thereof makes or sells the goods or performs the services on or in connection with which such mark is used. Applications and procedure under this section shall conform as nearly as practicable to those prescribed for the registration of trademarks.

[3] Application Serial No. 86759759, filed September 17, 2015.

Münchenwiler, Rüschegg and Wahlern of the canton of Bern.

2). In France this region includes the departments of Doubs, Jura, Haute-Saône, Savoie and Haute-Savoie as well as the cantons of Amberieu-en-Bugey, Bellegarde-sur-Valserine, Belley, Brénod, Ceyzériat, Champagne-en-Valromey, Coligny, Collonges, Ferney-Voltaire, Gex, Hauteville-Lompnes, Izernore, Lagnieu, Lhuis, Nantua, Oyonnax-Nord, Poncin, Pont-d'Ain, Saint-Rambert-en-Bugey, Seyssel, Treffort-Cuisiat, Virieu-le-Grand, Péronnas, Oyonnax-Sud, Viriat, Oyonnax, Bourg-en-Bresse in the department of Ain, the cantons of Fontaine-Française, Saint-Jean-de-Losne, Seurre in the department of Côte-d'Or, the cantons of Saint-Laurent-du-Pont and Touvet in the department of Isère, the cantons of Bourbonne-les-Bains, Bourmont, Clefmont, Fayl-la-Forêt, Laferté-sur-Amance, Langres, Longeau-Percey, Val-de-Meuse, Neuilly-l'Evêque, Nogent, Prauthoy, Terre-Natale in the department of Haute-Marne, the cantons of Beaurepaire-en-Bresse, Cuiseaux, Pierre-de-Bresse, Saint-Germain-du-bois in the department of Saône-et-Loire, the cantons of Bains-les-Bains, Darney, Lamarche, Monthureux-sur-Saône, Plombières-les-Bains, Xertigny in the department of Vosges, the cantons of Delle, Fontaine, Giromagny, Rougemont-le-Château, Valdoie, Châtenois-les-Forges, Danjoutin, Beaucort, Grandvillars, Offemont, Belfor in the department of Territoire de Belfort.

IDG has claimed ownership of Registration No. 4398395 (registered September 10, 2013) for the following certification mark for "cheese":



The terms SWITZERLAND and AOC are disclaimed, color is not claimed as a feature of the mark, and the English translation of "LE" in the mark is identified as "THE."[4] The registration also includes the following certification statement:

> The certification mark, as used by persons authorized by the certifier, certifies that the cheese originates in the Gruyère region of Switzerland including the cantons of Fribourg, Vaud, Neuchatel, Jura, and the districts of Courtelary, La Neuveville, Moutier, and the communes of Ferenbalm, Guggisberg, Mühleberg, Münchenwiler, Rüschegg and Wahlern of the canton of Bern.

In their Notices of Opposition, International Dairy Foods Association ("IDFA"), United States Dairy Export Council ("USDEC"), Atalanta Corporation ("Atalanta"), and Intercibus Incorporated ("Intercibus") (collectively "Opposers") allege that (i) Applicants have failed to exercise legitimate control over the proposed certification mark and hence it is incapable of functioning as a certification mark under Sections 4 and 45 of the Trademark Act, 15 U.S.C. §§ 1054, 1127; and (ii) GRUYERE is a generic name for cheese and unregistrable under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1).[5]

Applicants have denied Opposers' salient allegations in answers to each of Opposers' Notices of Opposition.[6] The parties have fully briefed the Oppositions.

---

[4] The mark is described as consisting of "the term 'LE GRUYÈRE SWITZERLAND' in a stylized font. The term 'SWITZERLAND' appears within a solid bar directly under 'LE GRUYÈRE'. To the right appears a stylized square containing the letters 'AOC' and a stylized Swiss cross."

[5] 1 TTABVUE in each Opposition.

[6] 5 TTABVUE in each Opposition.

## I.   The Record

In addition to the pleadings, pursuant to Trademark Rule 2.122(b), 37 CFR § 2.122(b) Applicants' opposed application is automatically of record. The parties have submitted the following:

### a.  Stipulation

The record includes a stipulation providing that those documents produced in response to a party's discovery requests are authentic and, accordingly, may be submitted by the producing party at trial by a notice of reliance without the need for authenticating testimony.[7] In addition, the stipulation provides that (i) the receiving party reserves the right to object, on grounds other than authenticity, to the admissibility of the documents produced in response to the other's discovery requests; (ii) a party retains the right to contest the authenticity of evidence the other party seeks to rely on from the other party's own productions; and (iii) each party retains the right to object to the admissibility of other evidence relied on by the other party, regardless of which party produced the evidence. The stipulation is approved. *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 501.02 (2019).

### b.  Opposers' Submissions:

● Declaration of John Umhoefer, Executive Director of Wisconsin Cheese Makers Association ("WCMA"), together with Exhibits A and B thereto, submitted as trial testimony

---

[7] Opposers' Notice of Reliance Exh. 112, 29 TTABVUE 64-66, 40 TTABVUE 61-64. The parties do not mention this stipulation in their briefs; they followed its provisions when they submitted their notices of reliance.

(the Declaration and exhibits comprise WCMA's response to Opposers' subpoena duces tecum) (20 TTABVUE).

● Declaration of Matthias Kunz, Chairman of Emmi Roth USA, Inc. ("Emmi Roth"), together with Exhibits A-C thereto, submitted as trial testimony (the Declaration and exhibits comprise Emmi Roth's response to Opposers' subpoena duces tecum) (20-21 TTABVUE).

● Declaration of Shawna Morris, Vice President of Trade Policy for USDEC, and exhibits. (23-26 TTABVUE).

● Opposers' Notice of Reliance (28-30 TTABVUE), and Corrected Notice of Reliance (40-41 TTABVUE),[8] submitting a copy of 21 C.F.R. § 133.149, cancelled registrations containing the term "gruyere,"[9] papers from prior trademark applications containing "gruyere," various publications, Applicants' discovery responses, and a duplicate copy of the Umhoefer and Kunz Declarations and most of their exhibits.

● Trial deposition testimony of Thomas Gellert, an officer of Atalanta, and exhibits. (31 TTABVUE).

● Trial deposition testimony of Fermo Jaeckle, an officer of Intercibus, and exhibits. (32 TTABVUE).

c. **Applicants' Submissions:**

● Applicants' Notice of Reliance submitting pages from "The Oxford Companion to Cheese" (Oxford Univ. Press 2016) and various webpage printouts. (35 TTABVUE).

---

[8] Opposers submitted the Corrected Notice of Reliance because the Notice of Reliance (28-30 TTABVUE) included confidential documents produced by Applicants and were not submitted under seal. Opposers requested that 29 and 30 TTABVUE be sealed, and resubmitted the Notice of Reliance as the Corrected Notice of Reliance (40 and 41 TTABVUE). The Board has sealed 29 and 30 TTABVUE from public viewing.

[9] We use GRUYERE in all capital letters with no accent on the first letter "e" to identify the term sought to be registered by Applicants and GRUYÈRE in all capital letters with an accent on the first letter "e" to identify the term Applicants use for a cheese made according to production standards including specific places of production, namely, western Switzerland and east-central France, as well as a term included in a registered certification mark of regional origin for such cheese. *See* Registration No. 4398395 mentioned above.

● The declaration of Marie Guittard, Director of the French National Institute of Origin and Quality, and exhibits. (36 TTABVUE).

● The declaration of Romain Sandoz, President of SIG, and exhibits. (36 TTABVUE).

● The declaration of Prof. Dr. Bernard Lehmann, Director of the Swiss Federal Office for Agriculture, and exhibits. (36 TTABVUE).

● The declaration of Philippe Bardet, IDG's Director, and exhibits. (37 and 38 TTABVUE).

**d. Rebuttal submissions by Opposers:**

● Opposers' Second Notice of Reliance submitting webpage printouts. (39 TTABVUE).

**e. English Translation of Agreement**

Opposers submitted a copy of an agreement in French titled "Gruyere AOC États-Unis/Protocole d'accord Emmi-IPG" dated May 10, 2012 between Emmi AG and IDG with their Notice of Reliance[10] (28-30 TTABVUE) and their Corrected Notice of Reliance (40-41 TTABVUE). Both submissions are accompanied by a statement that an English translation is also provided, but Opposers did not file the English translation with their Notices of Reliance. Opposers submitted a copy of the agreement with their main brief and provided an English translation along with a signed certificate from the individual who made the translation. (42 TTABVUE 39-40). Because Applicants have raised many objections (discussed next) to Opposers' evidence but have not objected to the English translation, we find that Applicants

---

[10] Opposers' Notice of Reliance Exh. 146, 28 TTABVUE 12; Opposers' Corrected Notice of Reliance Exh. 146, 40 TTABVUE 277.

have consented to the admission of the translation into the record and we have considered the translation.

## II.  Evidentiary Issues

### a.  Applicants' Objections

Applicants raised over 150 individual evidentiary objections in a bare bones fashion with little or no argument supporting each objection.[11] As discussed below, many of the objections are late or without merit.

### i.  Lack of Foundation

Applicants objected for the first time in a "Statement of Objections" filed with their main brief to the Morris, Kunz and Umhoefer Declarations[12] on the basis of lack of foundation. "As a general rule, objections that are curable must be seasonably raised, or they will be deemed waived." *Nahshin v. Prod. Source Int'l, LLC*, 107 USPQ2d 1257, 1259 (TTAB 2013). *See also* TBMP § 707.04 ("[O]bjections to … testimony, on substantive grounds, such as that the proffered evidence constitutes hearsay or improper rebuttal, or is incompetent, irrelevant, or immaterial, generally are not waived for failure to raise them promptly, unless the ground for objection is one which

---

[11] 48 TTABVUE.

[12] As noted above, Opposers submitted the Kunz and Umhoefer Declarations as trial testimony. (20-22 TTABVUE). The Declarations are dated prior to the date trial commenced. Although Applicants raised numerous objections to Opposers' evidence, Applicants never objected to the submission of the Kunz and Umhoefer Declarations as untimely. In fact, they treated the Declarations as having been properly submitted by not objecting to the fact that they were signed prior to the testimony period and by raising substantive objections against them. In view thereof, we consider them to have been properly submitted.

Opposers re-submitted the two Declarations and exhibits with their Notice of Reliance and amended Notice of Reliance — their re-submissions with the Notices of Reliance do not require us to consider them as something other than trial testimony.

could have been cured if raised promptly;" and "[a]s with testimony depositions, objections to the competency of a witness or to the competency, relevancy, or materiality of affidavit or declaration testimony must be raised at the time specified in Rule 32(d)(3)(A) of the Federal Rules of Civil Procedure."). In *Moke America LLC v. Moke USA, LLC*, 2020 USPQ2d 10400, at *5 (TTAB 2020), the Board explained that "[a]n objection to foundation raised for the first time in a trial brief is untimely because the party offering the testimony (whether by deposition, affidavit or declaration) does not have the opportunity to cure the alleged defect." Thus, Applicants' lack of foundation objections to the Morris, Kunz and Umhoefer Declarations and exhibits are late and Applicants have waived these objections.

### ii. Hearsay – General

Applicants raised numerous hearsay objections for the first time in their main brief; these objections are timely. *See* TBMP § 707.04, quoted above; *Anthony's Pizza & Pasta Int'l v. Anthony's Pizza Holding Co.*, 95 USPQ2d 1271, 1273 n.4 (TTAB 2009) ("plaintiff's hearsay objection to Ms. Delegal's testimony is not waived"), *aff'd*, 415 F. App'x 222 (Fed. Cir. 2010).

Applicants' hearsay objections to evidence which concerns public exposure to the term "gruyere" on the issue of genericness are baseless because we do not consider the evidence for the truth of any assertion made therein but only for public exposure to the term "gruyere" used in a generic (or non-generic) manner.[13] *See Harry Winston, Inc. v. Bruce Winston Gem Corp.*, 111 USPQ2d 1419, 1428 (TTAB 2014) ("such

---

[13] This particularly applies to the webpage evidence in the record. *See* for example Opposers' Notice of Reliance Exh. 83, 28 TTABVUE 272-459.

materials are frequently competent to show, on their face, matters relevant to trademark claims (such as public perception), regardless of whether the statements are true or false. Accordingly, they will not be excluded outright, but considered for what they show on their face."); *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1047 (TTAB 2017); *Safer v. OMS Invs., Inc.*, 94 USPQ2d 1031, 1039 (TTAB 2010). Such objections are overruled.[14]

### iii. Kunz Declaration and Exhibit C

Applicants objected to Mr. Kunz's testimony and Exhibit C on the basis of a lack of personal knowledge and hearsay.[15]

As background, Opposers served a subpoena duces tecum pursuant to Fed. R. Civ. P. 45 on Emmi Roth requesting documents and testimony on certain topics. Document Request No. 4, as amended, sought a document "which may be a table, chart, or other summary of information" evidencing annual sales in the United States by weight or dollar amount of cheese labeled "gruyere" that was not produced in Switzerland or France. Emmi Roth responded through Mr. Kunz's Declaration and Exhibit C thereto. Exhibit C is a chart labeled "Sales (in Pounds) of Domestically-Produced Roth-Branded Gruyere, 2012-2016" showing (i) sales of "Domestic Roth

---

[14] It is worth noting, however, that Mr. Umhoefer's representation that the documents submitted with his declaration are "true and correct business records" and "were obtained in a thorough search of WCMA's business records" under oath does not satisfy the requirements of Fed. R Evid. 803(6) pertaining to the business record exception to the hearsay rule, which requires affirmation that the record be of a regularly conducted activity. Mr. Umhoefer has not addressed these required conditions in his Declaration.

[15] 48 TTABVUE 24-25.

branded Gruyere;" and (ii) sales of "Domestic Private-Label branded Gruyere."[16] Mr. Kunz states that the chart "shows Emmi Roth's annual sales in the United States of cheese produced in the United States and labeled as Gruyere (both Roth branded and sold under third party private label brands), by weight for a time period of 2012-2016."[17]

Fed. R. Evid. 602 provides:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.

As evidence of his personal knowledge of the contents of Exhibit C, Mr. Kunz stated that he is Chairman of Emmi Roth and that he received the subpoena from Opposers; that he confirmed that its figures are based upon a review of Emmi Roth's business records; and that Exhibit C "accurately reflects those business records.[18] In addition, IDG identified Mr. Kunz as a person "responsible for [the] U.S. market" and "responsible for the sale of cheese [in the United States] by ["Emmi"] under the designation gruyere."[19] Applicants have not directly challenged the accuracy of the figures provided in Exhibit C or Mr. Kunz's statements.[20] We therefore find that Mr.

---

[16] Kunz Decl. Exh. C, 22 TTABVUE 27.

[17] *Id.* at ¶ 5, 21 TTABVUE 6.

[18] *Id.*

[19] IDG's response to Opposer's Interrog. No. 2, Opposer's Notice of Reliance Exh. 109, 40 TTABVUE 21 - 22.

[20] Mr. Kunz is an officer of a U.S. subsidiary of Emmi AG, one of IDG's member companies. He also signed the "Gruyere AOC États-Unis/Protocole d'accord Emmi-IPG" mentioned above on behalf of Emmi AG. Opposers' Notice of Reliance Exh. 146, 28 TTABVUE 12; Opposers' Corrected Notice of Reliance Exh. 146, 40 TTABVUE 277.

Kunz's statements in his Declaration satisfy the personal knowledge requirement of Rule 602, and overrule Applicants' objection to the Kunz Declaration and Exhibit C on the basis of no personal knowledge and that his testimony and the contents of Exhibit C are hearsay.

Applicants also asserted a relevance objection to Mr. Kunz's Declaration and Exhibit C. The relevance objection is overruled because the chart and testimony pertain to the amounts of non-Swiss and non-French cheese referred to as "gruyere" produced in the United States which is connected to the question of genericness.

### iv. Umhoefer Declaration

Applicants' objection to the Umhoefer Declaration on the basis of no personal knowledge is also overruled. Mr. Umhoefer, the Executive Director of the WCMA, testified that he "coordinated with WCMA employees to obtain copies of the documents requested in the subpoena through a search of WCMA's business records."[21] This is sufficient to establish that Mr. Umhoefer has personal knowledge of the origin of the documents produced by WCMA. Because we do not rely on the truth of any fact asserted in the documents, to the extent that Applicants object to our consideration of the Declaration and exhibits for the truth of any matter asserted, Applicants' objection is moot. *See Harry Winston,* 111 USPQ2d at 1428.

### v. Morris Declaration

Turning to Applicants' objection to Ms. Morris' Declaration and the 43 exhibits thereto on the basis of no personal knowledge, Applicants state:

---

[21] Umhoefer Decl. ¶3, 29 TTABVUE 287-88, 40 TTABVUE 281-82.

Ms. Morris states that these exhibits were contained in Opposers' files and produced to Applicants. … Because none of the exhibits were authored by Ms. Morris herself, and she has not shown that she has personal knowledge of the facts in those exhibits, they are barred by a number of evidentiary rules including Federal Rules of Evidence 603, 901, and 802.

Pursuant to Federal Rule of Evidence 603, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 603. Ms. Morris does not testify that she has personal knowledge of any of the information contained in the exhibits.[22]

Ms. Morris merely states in her Declaration that she understood that counsel for USDEC and IDFA produced the documents to Opposers, and even identifies the documents' Bates stamp numbers.[23] This is information that Applicants can verify directly, and Applicants have not indicated that the documents were not produced to them as Ms. Morris states in her Declaration. Further, as detailed below, we do not rely on the exhibits for the truth of any assertion made therein. Applicants' objection is therefore overruled.

Next, Applicants raised hearsay objections to the following exhibits submitted with Ms. Morris' Declaration:

(i) a list titled "WMMB Store Audits Where Boar's Head Brand Gruyere Was Found," and stating "Source: Custom Database complied by regional staff of the Wisconsin Milk Marketing Board" and "reflect[ing] results from audits conducted between 7/20/15 and 9/1/15; Boar's Head

---

[22] Applicants' Statement of Objections to Opposers' Evidence at p. 3, 48 TTABVUE 4.

[23] Morris Decl. ¶ 5, 23 TTABVUE 6.

gruyere was found during 108 audits conducted across 31 states";[24]

(ii) a list titled "Restaurant Operators That Mention Gruyere on the Menu," and stating "Source: Technomic MenuMonitor Database of menus from 7000+ U.S. restaurant chains and independents, and 250 food trucks" for "Q2 2016";[25]

(iii) a list titled "Wisconsin-identified Gruyere Items Found in WMMB [Wisconsin Milk Marketing Board] Store Audits";[26] and

(iv) undated "United States Import Statistics" for cheese from an unknown source.[27]

Ms. Morris states that "[p]art of [her] responsibilities at USDEC is to research the market for dairy products including cheese in the U.S. as is needed and to maintain documents related to those findings, including publications, reports, product information and labels from products in the marketplace"; that her "responsibilities at USDEC also include overseeing the monitoring of trademark applications filed by various organizations for certain cheeses and the keeping of records of the same when such applications are of interest to USDEC and its members"; that "[i]t is the regular practice of USDEC to research and collect such information and documents as is needed and keep records of the results in the ordinary course of business on matters of concern to our membership"; and that these documents are "a true and correct copy of a compilation of documents discovered in [her] research and contained in USDEC's

---

[24] *Id.*, Exh. 18, 24 TTABVUE 51.

[25] *Id.*, Exh. 20, 24 TTABVUE 58.

[26] *Id.*, Exh. 21, 24 TTABVUE 60.

[27] *Id.*, Exhs. 26 and 27, 24 TTABVUE 349-51.

business records relating to 'gruyere' cheese, which reference gruyere products as having been produced in the United States or in countries other than Switzerland and France."[28]

The Federal Rules of Evidence provide an exception to the rule against hearsay for records of regularly conducted activity kept in the ordinary course of business. *See* Fed. R. Evid. 803(6). The objected-to documents, however, are not documents that Ms. Morris's organization itself prepared. "When a business relies on a document it has not itself prepared, two factors bear on the admissibility of the evidence as a business record: '[1] that the incorporating business rely upon the accuracy of the document incorporated[,] and [2] that there are other circumstances indicating the trustworthiness of the document.'" *Christian Faith Fellowship Church v. Adidas AG*, 841 F.3d 986, 120 USPQ2d 1640, 1643 (Fed. Cir. 2016) (citing *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338 (Fed. Cir. 1999) ("the cases stress two factors, indicating reliability, that would allow an incorporated document to be admitted based upon the foundation testimony of a witness with first-hand knowledge of the record keeping procedures of the incorporating business, even though the business did not actually prepare the document. The first factor is that the incorporating business rely upon the accuracy of the document incorporated and the second is that there are other circumstances indicating the trustworthiness of the document.")). Ms. Morris has not persuaded us that there are other circumstances indicating the trustworthiness of the documents. For example, she has not stated that USDEC, or

---

[28] *Id*. at ¶¶ 4-5, 23 TTABVUE 6.

anyone else, relies on the accuracy of these documents. Applicants' hearsay objection to these exhibits is sustained.

Ms. Morris also submitted photographs of cheese labels with her Declaration.[29] Even though Applicants' objections on the grounds of no personal knowledge and no foundation to these exhibits have not been sustained (*see* discussion, *supra),* because there is no information as to when and where they were obtained, these exhibits have little probative value. We do not further consider these photographs.

### vi. Remaining Objections

With regard to Applicants' remaining objections, we need not rule on each of them because we are capable of weighing the relevance and strength or weakness of the objected-to evidence, including any inherent limitations. *See e.g., Norris v. PAVE: Promoting Awareness, Victim Empowerment*, 2019 USPQ2d 370880, 2 (TTAB 2019) (quoting *Inter IKEA Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1737 (TTAB 2014)); *Tao Licensing*, 125 USPQ2d at 1047. As necessary and appropriate, we point out any limitations in the evidence or otherwise note that the evidence cannot be relied upon in the manner sought. *See Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017); *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1478 (TTAB 2017) (where parties devoted more than 30 pages of their briefing to numerous detailed evidentiary objections, Board exercised discretion to rule explicitly only on major objections).

---

[29] *Id.*, Exhs. 6-7, 11-15, 24 TTABVUE 17, 19, 35-44.

### b. Nonconforming Evidence

We now address that evidence which does not comport with Board practice.

1. Both parties submitted documents in whole or in part in a foreign language without an English translation.[30] Material in foreign languages which has not been translated into English has limited probative value. *Swiss Watch Int'l Inc. v. Fed. of the Swiss Watch Ind.*, 101 USPQ2d 1731, 1734 n.8 (TTAB 2012); TBMP § 104 ("If a party intends to rely upon any submissions that are in a language other than English, the party should also file a translation of the submissions. If a translation is not filed, the submissions may not be considered"), and cases cited therein.

2. Reference materials from foreign sources pertaining to cheese, even if in English, have limited probative value on the question of genericness because they do not reflect usage, or exposure to consumers, of the term GRUYERE in the United States.[31] *In re Consolidated Cigar Corp.*, 13 USPQ2d 1481, 1483 (TTAB 1989) ("We agree with applicant that the evidence relating to generic use of 'whiffs' in Great Britain is, by and large, irrelevant to the genericness of the term in the United States. The relevant test is, of course, consumer perception in this country."); *cf. In re Bayer AG*, 488 F.3d 960, 82 USPQ2d 1828, 1835 (Fed. Cir. 2007) (information originating on foreign websites or in foreign news publications may be relevant to discern United States consumer impression of a proposed mark if it is shown they are accessible to the United States public).

---

[30] *See, e.g.*, Opposers' Notice of Reliance Exhs. 79, 80, 28 TTABVUE 254-56.

[31] *See, e.g.*, Aidan Ellis, Guide Du Fromage (English ed.) (Harper & Row Publishers (U.K.) 1973). Opposers' Notice of Reliance Exh. 98, 28 TTABVUE 796.

3. Applicants submitted materials bearing web addresses without a copy of the corresponding web pages.[32] The mere listing of a web address or hyperlink is insufficient to make the webpages associated with that address or hyperlink of record. *See In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1194 n.21 (TTAB 2018); *In re Olin Corp.*, 124 USPQ2d 1327, 1332 n.15 (TTAB 2017) ("Because the information displayed at a link's Internet address can be changed or deleted, merely providing a link to a website is insufficient to make information from that site of record.").

## III. Background

GRUYÈRE cheese has been made in Switzerland since 1115 AD. The name GRUYÈRE derives from the district of La Gruyère in the Canton of Fribourg in Switzerland, where it was first made.[33] GRUYÈRE cheese has also been made in France for hundreds of years.[34]

On December 10, 1981, the Federal Council of Switzerland issued a "Decree on the protection of the names of Swiss Cheeses" which listed GRUYÈRE as a protected designation and defined the production requirements for GRUYÈRE cheese. This protected designation was superseded by adoption of the Protected Designation of Origin ("PDO") for GRUYÈRE in 2001.[35] The European Union recognized the PDO in 2011 in an agreement between the European Union and Switzerland in 2011.[36] In

---

[32] *See, e.g.*, Bardet Decl. ¶¶ 14-18, 38 TTABVUE 6-8.

[33] *Id.* at ¶ 2, 38 TTABVUE 3.

[34] Sandoz Decl. ¶ 3, 36 TTABVUE 13.

[35] Lehmann Decl. ¶ 4-5, 36 TTABVUE 25.

[36] *Id.* at ¶ 17, 36 TTABVUE 27.

2012, the French National Institute of Origin and Quality ("INAO") approved

GRUYÈRE as a "protected geographical indication" ("PGI") for a limited area in

France, pursuant to an application filed in 2010.[37]

> PDO and PGI designations are used for agricultural products that traditionally have been produced in a particular geographic region. When used on a product, the PDO and PGI designations guarantee that the food product originates in the specific region or follows a particular traditional production process. Protected Designation of Origin (PDO) (or Appellation d'origine protégée (AOP) in French) certifies the strongest link to the territory. It requires that the product comes from a particular region, that the product's "quality or characteristics are essentially or exclusively due to a particular geographical environment with its inherent natural and human factors," and that all aspects of production, processing, and preparation originate from that region. [PGI] … certifies the local know how and the close link between the product and the place or region. For registered products, at least one of the stages of production, processing or preparation must take place in the region.

> These designations help to highlight the qualities and tradition associated with registered products and to assure consumers that these are the genuine products, not imitations seeking to benefit from the good name and reputation of the original. As a result, these geographic designations help producers and groups of producers market their products better, while providing them with legal protection from misuse or falsification of a product name.[38]

---

[37] Guittard Decl. ¶ 6, 36 TTABVUE 3. INAO is an administrative agency within the French Ministry of Agriculture, Food, and Forestry. *Id*. at ¶ 1, 36 TTABVUE 2.

[38] Lehmann Decl. ¶¶ 6-7, 36 TTABVUE 25.

IDG is responsible for the certification rules for the production of GRUYÈRE cheese in Switzerland; it controls which cheeses may be sold under the GRUYÈRE PDO, and controls the use of the GRUYÈRE PDO, in Switzerland.[39]

SIG is an association of three main groups of entities and individuals involved in the production of GRUYÈRE cheese in France: milk producers, cheesemakers, and "cheese maturers." SIG administers the certification rules for the use in France of the GRUYÈRE PGI, certifies which cheese may bear the GRUYÈRE PGI, and controls the use of the GRUYÈRE PGI in France.[40]

Millions of pounds of cheese labeled with the Swiss PDO GRUYÈRE are imported into the United States from Switzerland per year.[41] According to SIG records, approximately 14,000 pounds of cheese labeled with the French PGI GRUYÈRE have been exported from France to the United States for the period 2013-2017.[42]

## IV. Standing

A threshold issue in every inter partes case is the plaintiff's standing to challenge registration. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *John W. Carson Found. v. Toilets.com, Inc.*, 94 USPQ2d 1942, 1945 (TTAB 2010). The U.S. Court of Appeals for the Federal Circuit has enunciated a liberal threshold for determining standing, namely that a plaintiff must demonstrate that it possesses a "real interest" in a proceeding beyond that of a

---

[39] Bardet Decl. ¶ 1, 37 TTABVUE 2.

[40] Sandoz Decl. ¶ 2, 36 TTABVUE 12.

[41] Bardet Decl. ¶ 2, 37 TTABVUE 3.

[42] Sandoz Decl. ¶ 8, 36 TTABVUE 15.

mere intermeddler, and "a reasonable basis for his belief of damage." *Empresa Cubana Del Tabaco,* 111 USPQ2d at 1062; *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). A "real interest" is a "direct and personal stake" in the outcome of the proceeding. *Ritchie*, 50 USPQ2d at 1026. A belief in likely damage can be shown by establishing a direct commercial interest. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

Where, as here, there are multiple opposers, each opposer must plead and prove its own standing in each proceeding. *Stuart Spector Designs, Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 1553 (TTAB 2009); *Apollo Med. Extrusion Techs., Inc. v. Med. Extrusion Techs., Inc.*, 123 USPQ2d 1844, 1848 (TTAB 2017). Where a plaintiff has proven standing as to at least one properly pleaded ground, it has established standing for any other legally sufficient ground. *See, e.g., Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1727-28 (Fed. Cir. 2012) ("[O]nce an opposer meets the requirements for standing, it can rely on any of the statutory grounds for opposition set forth in 15 U.S.C. § 1052."); *Petróleos Mexicanos v. Intermix S.A.*, 97 USPQ2d 1403, 1405 (TTAB 2010).

Neither Opposers nor Applicants have addressed the issue of Opposers' standing in their briefs. We therefore have reviewed the record to determine whether each Opposer has established its standing.

### a. U.S. Dairy Export Council

Under Trademark Act Section 13, 15 U.S.C. § 1063, "[a]ny person who believes that he would be damaged ... by the registration of a mark upon the principal register"

may file an opposition. The term person includes "a juristic person" which includes associations. Trademark Act Section 42, 14 U.S.C. § 1127. An "association" is a recognized juristic entity when it is organized under state laws or federal statutes that govern this form of organization. TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 803.03(c) (2019). An association has standing if it proves that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.*, 823 F.2d 490, 2 USPQ2d 2021, 2025 (Fed. Cir. 1987).

We first look to USDEC's pleading regarding its standing. USDEC pleaded that; (i) it is a trade organization that represents the global trade interests of U.S. dairy producers, proprietary processors and cooperatives, ingredient suppliers and export traders; (ii) it "has more than 120 members in these industries, including a company with a commercial interest in non-French and non-Swiss gruyere cheese in the United States"; (iii) its members have strong interests in preserving the integrity of U.S. cheese standards of identity, upon which numerous members rely to provide U.S. government guidance on a variety of common cheese terms; (iv) "if Applicants' certification mark application for GRUYERE is approved for registration, Applicants would have the prima facie exclusive right to control the use of the term GRUYERE as a mark certifying certain kinds of cheese products"; and (v) "[s]uch registration will directly damage Opposer, Opposer's members, consumers, and others who have

a right to use the common food name GRUYERE to identify gruyere cheese products in the United States."[43] We find that USDEC has properly pleaded its standing.

In support of USDEC's standing, Ms. Morris states:

> USDEC is a non-profit, independent membership organization that represents the global trade interests of United States-based dairy producers, processors, cooperatives, ingredient suppliers, and export traders. USDEC seeks to enhance demand for U.S. dairy products and ingredients, which we accomplish through a variety of approaches including research and collaboration with our members, governmental entities, and other organizations whose common goal is to ensure the health and vitality of the United States dairy industry.[44]

We find that USDEC has established its standing to represent its members under the *Jeweler's Vigilance* test. First, those of USDEC's members who manufacture, import or sell cheeses would have the standing to oppose registration of Applicants' mark in their own right, especially on the grounds asserted in this proceeding. We have not located any evidence of record identifying entities that are members of USDEC, but its membership as described by Ms. Morris allows for the inclusion of entities such as Atalanta and Intercibus, which are plaintiffs with standing in this proceeding. (*See* discussion *infra*.) Second, Ms. Morris states that USDEC's purpose is to represent the global trade interests of U.S. dairy producers, proprietary processors and cooperatives, ingredient suppliers and export traders that have strong interests in preserving the integrity of U.S. cheese standards of identity, upon which numerous members rely to provide U.S. government guidance on a variety of common

---

[43] Notice of Opposition at ¶¶ 6-10 (Opp. No. 91232442), 1 TTABVUE 5-6.

[44] Morris Decl. ¶ 2, 23 TTABVUE 5-6.

cheese terms. As a USDEC employee, Ms. Morris "oversee[s] the monitoring of trademark applications filed by various organizations for certain cheeses and .,. [keeps] records of the same when such applications are of interest to USDEC and its members."[45] The ability to refer to non-Swiss and non-French cheese as "gruyere" thus is germane to USDEC's purpose. *See Univ. Book Store v. Univ. of Wisc. Bd. of Regents*, 33 USPQ2d 1385, 1392 (TTAB 1994) ("opposing the registrations sought by applicant is germane to WMF's purpose inasmuch as part of its mission is to promote the economic interests of its members …."). Finally, the proceeding and the relief sought — denial of registration of the applied for mark — does not require the actual participation of USDEC's members in the proceeding. USDEC claims genericness and failure to control, which are not specific to a particular entity. USDEC thus has "standing to seek relief on the basis of the legal rights and interest of others." *Warth v. Seldin*, 422 U.S. 490, 501 (1974).

## b. International Dairy Foods Association

There is no information in the record concerning IDFA and there is no argument in the briefs regarding IDFA's standing. Because a party must establish its standing to prevail before the Board, and IDFA has not done so, IDFA's opposition (Opp. No. 91232427) is dismissed with regard to both pleaded claims.[46]

---

[45] *Id*. at ¶ 4, 23 TTABVUE 6.

[46] In view of our dismissal of IDFA's opposition, the term "Opposers" is amended to hereafter refer to the remaining plaintiffs in this consolidated proceeding.

### c. Atalanta Corporation and Intercibus, Inc.

Atalanta and Intercibus both plead that they have used the term GRUYERE in connection with the importation and resale of cheese produced in Austria, Germany or Finland for many years; and that "[i]f Applicants' certification mark application for GRUYERE is approved for registration, Applicants would have the prima facie exclusive right to control the use of the term GRUYERE as a mark certifying certain kinds of cheese products. Such registration will directly damage Opposer, consumers, and others who have a right to use the common food name GRUYERE to identify gruyere cheese products in the United States."[47]

When challenging a term as generic, a plaintiff may establish standing by showing that it is engaged in the sale of goods that are the same as or related to those covered by the challenged mark. *See Eastman Kodak Co. v. Bell & Howell Document Mgmt. Prods. Co.*, 23 USPQ2d 1878, 1879 (TTAB 1992), *aff'd*, 994 F.2d 1569, 26 USPQ2d 1912 (Fed. Cir. 1993); *Binney & Smith Inc. v. Magic Marker Indus., Inc.*, 222 USPQ 1003, 1010 (TTAB 1984).

Mr. Gellert, President of Atalanta, testified that Atalanta imports and sells "pretty much every sort of core variety of cheese that you could imagine" to food service distributors, major retailers and food manufacturers;[48] and IDG's counsel has sent Atalanta a cease and desist letter.[49] *See Ipco. Corp. v. Blessings Corp.*, 5 USPQ2d 1974, 1976-77 (TTAB 1988) (standing found where applicant had sent opposer cease

---

[47] Opp. No. 9123446, 1 TTABVUE; Opp. No. 91232448, 1 TTABVUE.

[48] Gellert Depo. at pp. 10-11, 31 TTABVUE 12-13.

[49] Opposers' Notice of Reliance Exh. 122, 40 TTABVUE 119-20.

and desist letters). Further, Mr. Jaeckle, an officer of Intercibus, testified that Intercibus imports "Austrian Gruyere" and resells cheese;[50] and that IDG visited the Intercibus display in a Fancy Food Show in New York and "created a bit of a stir by insisting that we remove our display of Gruyere and insisting that … the only Gruyere came from Switzerland and that it was illegal for us to display cheese not … labeled Gruyere."[51]

In view of the forgoing, we find that Atalanta and Intercibus have properly pleaded and established their standing.

## V.  Genericness

We now consider Opposers' claim of genericness. If Opposers prevail on this claim, we need not consider their claim pertaining to a lack of control of the applied-for certification mark.

"A generic name—the name of a class of products or services—is ineligible for federal trademark registration." *USPTO v. Booking.com B.V.*, 140 S. Ct. 2298, 2020 USPQ2d 10729, *1 (2020). There is a two-part test used to determine whether a designation is generic: (1) what is the genus of goods or services at issue; and (2) does the relevant public understand the designation primarily to refer to that genus of goods or services? *H. Marvin Ginn Corp. v. Int'l Assn. of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986). The relevant public's perception is the primary consideration in determining whether a term is generic. *Loglan Inst. Inc. v.*

---

[50] Jaeckle Depo. at pp. 13-14, 32 TTABVUE 15.

[51] *Id*. at pp. 35-36, 32 TTABVUE 37-38.

*Logical Language Grp. Inc.*, 902 F.2d 1038, 22 USPQ2d 1531, 1533 (Fed. Cir. 1992). We may obtain evidence of the public's understanding of a term from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers and other publications. *Id.*; *see also Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 127 USPQ2d 1041, 1046 (Fed. Cir. 2018); *Dan Robbins & Assocs, Inc. v. Questor Corp.*, 599 F.2d 1009, 202 USPQ 100, 105 (CCPA 1979). "[A] term is generic if the relevant public understands the term to refer to part of the claimed genus of goods or services, even if the public does not understand the term to refer to the broad genus as a whole." *In re Cordua Rests., Inc.* 823 F.3d 594, 118 USPQ2d 1632, 1638 (Fed. Cir. 2016). A generic term may refer to a category of products. *Royal Crown*, 127 USPQ2d at 1046 ("We made clear [in *Cordua*] that '[t]here is no logical reason to treat differently a term that is generic of a category or class of products where some but not all of the goods identified in an application fall within that category.' [*Cordua*, 118 USPQ2d] at 605 (quoting *In re Analog Devices, Inc.*, [6 USPQ2d 1808, 1810 (TTAB 1988)])."

It is Opposers' burden to establish that GRUYERE is generic by a preponderance of the evidence. *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 114 USPQ2d 1827, 1830 (Fed. Cir. 2015) ("In an opposition or cancellation proceeding, the opposer or petitioner bears the burden of proving genericness by a preponderance of the evidence.") (citing *Magic Wand Inc. v. RDB Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1554 (Fed. Cir. 1991); *Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1761 (TTAB 2013), *aff'd,* 565 Fed. Appx. 900 (Fed. Cir. 2014)).

### a. The genus of the goods at issue

The genus of the goods typically is determined by focusing on the identification of goods in the subject application. *See Cordua Rests.*, 118 USPQ2d at 1636; *Magic Wand*, 19 USPQ2d at 1552 ("[A] proper genericness inquiry focuses on the description of [goods or] services set forth in the [application or] certificate of registration."); *Milwaukee Elec. Tool Corp. v. Freud Am., Inc.*, 2019 USPQ2d 460354, *8 (TTAB 2019) (citing *Magic Wand*); *Sheetz of Del., Inc. v. Doctor's Assocs. Inc.*, 108 USPQ2d 1341, 1350 (TTAB 2013). Here, we find the genus to be established by the identification of goods, "cheese."[52]

### b. The relevant public

The relevant public for a genericness determination is the purchasing or consuming public for the identified goods. *Magic Wand*, 19 USPQ2d at 1553 (citing *In re Montrachet S.A.*, 878 F.2d 375, 11 USPQ2d 1393, 1394 (Fed. Cir. 1989)); *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987); *Marvin Ginn*, 228 USPQ at 530; *Dan Robbins & Assocs.,* 202 USPQ at 105. Here, the relevant public consists of members of the general public who purchase or consume cheese.

### c. Public perception

We now consider whether the relevant public understands the designation primarily to refer to the genus or a part thereof. We set forth below the pertinent evidence of record, which includes dictionary definitions, articles and excerpts from

---

[52] The parties did not address the genus in their briefs.

articles, government regulations, statistics, webpages, witness testimony, and promotional materials. *See Alcatraz Media*, 107 USPQ2d at 1762 ("Competent sources to show the relevant purchasing public's understanding of a contested term include purchaser testimony, consumer surveys, dictionary definitions, trade journals, newspapers and other publications." (citations omitted)).

### i. Evidence Relied on by Opposers

<u>Definitions of "gruyere"</u>[53]

- thefreedictionary.com

  American Heritage Dictionary of the English Language (Fifth Ed. 2016)
  "A nutty, pale yellow, firm cheese made from cow's milk."

  Random House Kernerman Webster's College Dictionary (2010)
  "a firm yellow cow's milk cheese, esp. of France and Switzerland, having small holes."[54]

- oxforddictionaries.com

  A firm tangy cheese.[55]

<u>Definition of "gruyere cheese"</u>

- merriam-webster.com

  *1 :* a pressed whole-milk cheese of a pale yellow color and nutty flavor and usually with small holes

---

[53] The entry from collinsdictionary.com (Opposers' Notice of Reliance Exh. 85, 28 TTABVUE 552-53) is of no probative value because it contains the British spelling of the term "colour," reflecting that it is British English, not American English. The issues before us concern the perceptions of American, not British, consumers. *Cf. In re Consolidated Cigar*, 13 USPQ2d at 1483 ("We agree with applicant that the evidence relating to generic use of 'whiffs' in Great Britain is, by and large, irrelevant to the genericness of the term in the United States. The relevant test is, of course, consumer perception in this country.").

[54] http://www.thefreedictionary.com/Gruyere, Opposers' Notice of Reliance Exh. 88, 28 TTABVUE 577-78.

[55] https://en.oxforddictionaries.com/definition/us/gruyere, Opposers' Notice of Reliance Exh. 87, 28 TTABVUE 570-71.

*2 :* a process cheese made in small forms and wrapped in foil.[56]

<u>Uses of "gruyere cheese" in the press</u>

Approximately 50 uses of "gruyere cheese" in excerpts of articles from May 2010 to February 2011, including the following:

- Chicago Tribune
  October 7, 2010
  Ready for the marathon? We offer places to get your carbo-load on[.]
  ... kasespatzle ($15.95) takes house-made spaetzle and adds crispy bacon, caramelized onions and scallions. It's then baked with gruyere cheese until each gooey forkful is trailed by dangling cheese threads.[57]

- Orange County Register (California)
  December 16, 2010
  Paris in a Cup carries the tea room torch[.]
        ... plenty for two to fill up, but I wanted to try the Genevieve ($16), a quiche made with gruyere cheese, spinach and onion. It was rather rustic, with a thick flaky puff pastry crust, and had been baked in a round ….[58]

- The Oregonian (Portland Oregon)
  December 3, 2010
  Rucker's fledgling ready for takeoff
        ... Bancorp Tower, across Southwest Sixth Avenue, and other downtown digs might order a simple Parisian ham, gruyere cheese, mustard and greens on baguette sandwich ($7) or the sublime "Le Pigeon" burger with fries ($10) or a ....[59]

<u>Uses of "Wisconsin gruyere" in the press</u>

Ten uses of "Wisconsin gruyere" appearing in excerpts of articles dated from Feb. 1, 2001 to July 17, 2011, including the following:

---

[56]     https://www.merriam-webster.com/dictionary/Gruy%C3%A8re%20cheese, Opposers' Notice of Reliance Exh. 86, 28 TTABVUE 558-59.

[57] *Id*. at Exh. 89, 28 TTABVUE 593.

[58] *Id*., 28 TTABVUE 587.

[59] *Id*., 28 TTABVUE 589.

● The Houston Chronicle
September 16, 2010
Houston Dairymaids warehouse adds tastings [-] Sample artisan cheese
One recent tasting featured the top winners from the latest American Cheese Society confab in Seattle, so I went home with hunks of a shockingly good Wisconsin gruyere, the Grand Cru Gruyere Surchoix from Wisconsin. I had no idea an American gruyere could approach the deep, nutty tang of its European Alpine cousins.[60]

Use of "gruyere" in reference materials and trade and merchant publications

● Herbst, Sharon Tyler, and Herbst, Ron, The Cheese Lover's Companion (2007)

Under the entry for "Gruyère (AOC)" and states, "[i]n America, Roth Käse USA Ltd., of Monroe, Wisconsin, makes an award-winning version called Grand Cru Gruyere. … They produce three versions of Gruyere …."[61]

● Cheese Market News (May 25, 2007)

Gruyere appeals to chefs and consumers alike with flavor

Gruyere is a name controlled product in the European Union, and while it is best known as a Swiss cheese, all the countries surrounding the Alps – Germany, Austria, France and Switzerland – have a tradition of making Gruyere…. In competition, Roth Käse Gruyere has stood toe-to-toe with Swiss Gruyere and held its own."[62]

● Peterson "Specialty Cheese Catalog" (April 17, 2013)

Beecher's signature cheese, Flagship is a creamy combination of cheddar and gruyere, carefully aged for one year and delivering a distinctive, robust, nutty flavor. … Roth Käse – Monroe, WI [-] Nestled in the rolling

---

[60] Opposers' Notice of Reliance Exh. 90, 28 TTABVUE 638.

[61] *Id*. at Exh. 105, 28 TTABVUE 832-33.

[62] *Id*. at Exh. 82, 28 TTABVUE 269. Applicants' objection on the ground of hearsay to this publication (48 TTABVUE 6) is overruled. We consider the statement not for the truth of the matter asserted, but as exposing readers to the statement that there are other non-Swiss and non-French sources of GRUYERE. *See Safer*, 94 USPQ2d at 1039.

hills of Southern Wisconsin, Roth Käse's chalet factory houses a Swiss-made copper vat for the traditional production of Gruyère.[63]

- Atalanta brochure

  Listing Ammerlander cheeses including "gruyere" as a cheese along with Fontina,[64] Swiss, Gouda and Smoked Gruyere as company product selections sourced in Germany.[65]

Internet evidence

- http://www.cheesemakingrecipe.com (downloaded Feb. 10, 2011)

  How to Make Homemade Gruyere Cheese.[66]

- http://www.practically edible.com (downloaded Feb. 10, 2011)

  American-made Gruyere will be aged 3 months.[67]

- http://www.bolenvalecheese.com (downloaded Feb 25, 2011)

  Check out our large selection of the finest cheeses Wisconsin has to offer! …

---

[63] Opposers' Notice of Reliance Exh. 84, 28 TTABVUE 481-549. Exh. 135 to Opposers' Corrected Notice of Reliance is a letter from IDG's counsel addressed to "Peterson Company" of Auburn, Washington, and identifies Peterson as a seller of cheese, with a website.

Applicants maintain that the Peterson catalog is out of date because it mentions Roth's Wisconsin "Gruyere" and Roth has since changed the name to GRAND CRU. *See* Applicants' brief at p. 38-39, 47 TTABVUE 40-41. The catalog does not bear a date but other evidence shows that Emmi Roth discontinued using the term "gruyere" on cheese bearing its label in 2014. Because 2014 was not too long prior to trial which began in mid-2018, the probity of this document is not reduced as Applicants would have us find.

[64] In *In re Cooperative Produttori Latte E Fontina Valle D'Aosta,* 230 USPQ 131, 134 (TTAB 1986), the Board found that "fontina" is not a certification mark indicating regional origin, but that "fontina" primarily signifies a type of cheese (much like brie, swiss, parmesan or mozzarella) regardless of regional origin.

[65] Mr. Gellert identified Atalanta's purchasers as "food service distributors, major retailers and food manufacturers." Gellert Depo. at p. 10, 31 TTABVUE 12.

[66] Opposers' Notice of Reliance Exh. 90, 28 TTABVUE 606.

[67] *Id.*, 28 TTABVUE 608.

Gruyère-$11.25[68]

- http://www.sidwainer.com (downloaded Feb. 25, 2011)

  Our Gruyere, made with time-honored techniques which date back to the twelfth century is a product of the USA.[69]

- http://eatwisconsincheese.com (downloaded March 1, 2010)

  Listing "Gruyere"[70]

- http://houseofwisconsincheese.com (downloaded March 1, 2012)

  Listing "Gruyere" along with "Cheddar," "Cottage Cheese" and "Farmer's," and stating "Today, Wisconsin cheesemakers produce award-winning, hand-crafted Gruyere using classic production techniques and hand-crafted copper vats."[71]

- www.wacheese-gifts.com (downloaded September 9, 2016)

  Grand Cru Gruyere … Origin: Wisconsin
  Grand Cru Gruyere Surchoix … Origin: Wisconsin
  Grand Cru Gruyere Reserve … Origin: Wisconsin[72]

- www.cheezwhse.com (downloaded September 9, 2016)

  Austrian Alps Gruyere … Based on the popular cheese from Switzerland by the same name, this pasteurized Gruyere is also made in the Alps, but in Austria.[73]

- www.savorysweetlife.com (downloaded September 9, 2016)

  Bacon Mac & Cheese with Wisconsin Gruyère[74]

- www.recipegoldmine.com (downloaded September 9, 2016)

---

[68] *Id.*, 28 TTABVUE 621.

[69] *Id.*, 28 TTABVUE 622.

[70] *Id.*, 28 TTABVUE 649.

[71] *Id.*, 28 TTABVUE 659-60.

[72] *Id.*, 28 TTABVUE 679-81.

[73] *Id.*, 28 TTABVUE 682.

[74] *Id.*, 28 TTABVUE 682.

Green Bean and Wisconsin Gruyère Casserole with Spicy Onion Rings[75]

● www.jonesdairyfarm.com (downloaded September 9, 2016)

Ham & Wisconsin Gruyère Spirals[76]

● www.igourmet.com (downloaded September 9, 2016)

Austrian Alps Gruyere

A delicacy originally from the Gruyere district of Switzerland, this cheese is best known as a key fondue ingredient. This Austrian version offers all you'd expect in an Alpine Gruyere.[77]

● www.dairyspot.com (downloaded September 9, 2016)

Wisconsin Gruyère cheese, grated

● https://chefswarehouse.com (downloaded September 9, 2016)

Gruyere Natural Austrian …

Country of Origin: Austria[78]

● www.cheesedelicatessen.com (downloaded September 9, 2016)

Smoked Gruyere Cheese From Germany[79]

● www.caputocheesemarket.com (downloaded September 9, 2016)

Gruyere Austrian $8.99

Gruyere cheese is made throughout the Alps.[80]

● http://boarshead.com (downloaded July 13, 2017)

---

[75] *Id.*, 28 TTABVUE 684.

[76] *Id.*, 28 TTABVUE 685.

[77] *Id.*, 28 TTABVUE 686.

[78] *Id.*, 28 TTABVUE 686.

[79] *Id.*, 28 TTABVUE 690.

[80] *Id.*, 28 TTABVUE 691.

BLANC GRUE GRUYERE CHEESE

Prepared in the traditional manner in copper vats, this earthy cheese is made with milk from small family farms in Wisconsin.[81]

● http://www.cheesedelicatessen.com (downloaded July 11, 2017)

Austrian Alps Gruyere ½ lb.[82]

● http://www.cheezwhse.com (downloaded July 11, 2017)

Austrian Alps Gruyere[83]

● https://scontent.fewrl-2.fna.fbcdn.net (downloaded July 13, 2017)

Austrian Gruyere $4.99/lb[.][84]

● https://cariboucoffee.com (downloaded July 12, 2017)

HAM AND GRUYERE PRETZEL ROLL

Roasted Black Forest ham, Austrian Gruyere cheese and Dijon mustard on a pretzel roll[85]

● https://todaytopreviews.com/gruyere-cheese/ (downloaded July 12, 2017)

Austrian Alps Gruyere …

Wisconsin Gruyere Cheese

What is Gruyere cheese made in America? Well, the Wisconsin Gruyere is a rich melting cheese ideal for scallop potatoes with Gruyere cheese, fondue dip for nachos, that is comparable to the Swiss version. Not among the substitutes for Gruyere, but a real, homemade style kind of cheese with high nutrition values, Wisconsin Gruyere is a delight in any recipe. With a price of only $11 per 8 ounces,

---

[81] *Id.*, Exh. 99, 28 TTABVUE 800.

[82] *Id.*, Exh. 100, 28 TTABVUE 803.

[83] *Id.*, 28 TTABVUE 804.

[84] *Id.*, 28 TTABVUE 805.

[85] *Id.*, Exh. 101, 28 TTABVUE 807.

you should definitely try this affordable lightly smoked Gruyere cheese.[86]

● http://www.igourmet.com (downloaded July 11, 2017)

Austrian Alps Gruyere is another Gruyere type, made in Austria.

Gruyere Cheese Information

Igourmet.com sells over 700 cheeses, from around the world. One of our favorites is Gruyere. An Alpine cheese, Gruyere is made in Switzerland, France and Austria. A wonderful new family of Gruyere [c]heeses is also being made in Wisconsin by Emmi Roth USA.[87]

● http://www.wacheese-gifts.com (downloaded July 12, 2017)

GRAND CRU GRUYERE RESERVE[88]

● http://www.cheesers.com (downloaded July 12, 2017)

Wisconsin Gruyere 8 oz[.][89]

---

[86] *Id.*, Exh. 102, 28 TTABVUE 813, 815.

[87] *Id.*, Exh. 103, 28 TTABVUE 821-22.

[88] *Id.*, Exh. 104, 28 TTABVUE 824.

[89] *Id.*, 28 TTABVUE 825.

Internet Evidence from Producers and Sellers (downloaded November 2018)[90]

● https://www.ralphs.com/search?query=gruyere[91]



---

[90] Applicants maintain that three of the merchants listed in this grouping have discontinued use of "gruyere" for private label cheese. (Applicants' brief at 35, 47 TTABVUE 37.) Even if true, the webpage evidence reflects that consumers were still exposed to generic uses of "gruyere" as of November 2018.

[91] Opposers' Second Notice of Reliance Exh. 161, 39 TTABVUE 7. The webpage lists the following; Boar's Head Gruyere Cheese, Murry's Gruyere, Gerber Emmi Le Gruyere, Boar's Head Smoked Gruyere Cheese, Murray's Cave Aged Gruyere and Boar's Head Hickory Smoked Gruyere Cheese.

● https://boarshead.com/products/detail/974-pre-cut-gruyere-cheese[92]



---

[92] *Id*., Exh. 162, 39 TTABVUE 10.

● http://www.mandifoods.com/shop/search.aspx?sfield=keywords&amp;search=gruy ere[93]



---

[93] *Id.*, Exh. 163, 39 TTABVUE 13.

● https://www.redapplecheese.com/products/apple-smoked-cheese[94]



---

[94] *Id.*, Exh. 164, 39 TTABVUE 16.

● http://www.foodinno.com/?post_type=product&s=gruyere[95]



Food and Drug ("FDA") regulation regarding "Gruyere"

Section 133.149 of 21 C.F.R.,[96] which provides a standard of identity for "gruyere"

cheese," does not refer to a required origin but does specify that the cheese "contains

---

[95] *Id.*, Exh. 165, 39 TTABVUE 21.

[96] The regulation provides in relevant part:

(a) Description. (1) Gruyere cheese is the food prepared by the procedure set forth in paragraph (a)(3) of this section or by any other procedure which produces a finished cheese having the same physical and chemical properties. It contains small holes or eyes. It has a mild flavor, due in part to the growth of surface-curing agents. The minimum milkfat content is 45 percent by weight of the solids and the maximum moisture content is 39 percent by weight, as determined by the methods described in § 133.5. The dairy ingredients used may be pasteurized. The cheese is at least 90 days old.

(2) If pasteurized dairy ingredients are used, the phenol equivalent value of 0.25 gram of gruyere cheese is not more than 3 micrograms as determined by the method described in § 133.5.

(3) One or more of the dairy ingredients specified in paragraph (b)(1) of this section may be warmed and is subjected to the action of lactic acid-producing

small holes or eyes"; "has a mild flavor"; has a "minimum milkfat content [of] 45 percent," and a "maximum moisture content [of] 39 percent"; and "is at least 90 days old." 21 C.F.R. § 133.149(a)(1). The regulation describes the process by which the cheese must be prepared and the ingredients that can be used in it in order for the cheese to be labeled with the term "gruyere cheese."

USDA Material

- http://apps.fas.usda.gov (U.S. Department of Agriculture Foreign Agricultural Service)[97]

"Results of search in USDA database showing source of processed gruyere[98] imported to United States" (September 9, 2016)

---

and propionic acid-producing bacterial cultures. One or more of the clotting enzymes specified in paragraph (b)(2) of this section is added to set the dairy ingredients to a semisolid mass. The mass is cut into particles similar in size to wheat kernels. For about 30 minutes the particles are alternately stirred and allowed to settle. The temperature is raised to about 126°F. Stirring is continued until the curd becomes firm. The curd is transferred to hoops or forms, and pressed until the desired shape and firmness are obtained. The cheese is surface-salted while held at a temperature of 48° to 54°F for a few days. It is soaked for 1 day in a saturated salt solution. It is then held for 3 weeks in a salting cellar and wiped every 2 days with brine cloth to insure growth of biological curing agents on the rind. It is then removed to a heating room and held at progressively higher temperatures, finally reaching 65 °F with a relative humidity of 85 to 90 percent, for several weeks, during which time small holes, or so-called eyes, form. The cheese is then stored at a lower temperature for further curing. One or more of the other optional ingredients specified in paragraph (b)(3) of this section may be added during the procedure. ***

(c) Nomenclature. The name of the food is "gruyere cheese".

[97] Opposers' Notice of Reliance Exh. 92, 28 TTABVUE 674.

[98] Mr. Gellert testified regarding gruyere processed cheese that "it's taking natural cheese and melting it and reformulating [it] to a processed cheese. The main ingredient is a Gruyere cheese. We have done that both from Switzerland and from Germany for dozens of years." Gellert Depo. at p. 12, 31 TTABVUE 14.

21 C.F.R. § 133.169(a)(1) defines "pasteurized process cheese" as "the food prepared by comminuting and mixing, with the aid of heat, one or more cheeses of the same or two or more varieties, except cream cheese, neufchatel cheese, cottage cheese, lowfat cottage cheese, cottage cheese dry curd, cook cheese, hard grating cheese, semisoft part-skim cheese, part-

| Area/Partners of Origin And General Commodities Imported | | | 2013 | 2014 | 2015 | January - December Cumulative To Date Quantities Jan - Jul 2015 | Jan - Jul 2016 | |
|---|---|---|---|---|---|---|---|---|
| Partner | Product | UOM | Qty | Qty | Qty | Qty | Qty | Period/Period % Change (Qty) |
| Netherlands | 0406305100 - CH,PR-G,QT | MT | 1,127.7 | 1,561.7 | 1,805.1 | 1,064.6 | 808.3 | -24 |
| Netherlands | 0406305300 - CH,PR-G,OQ | MT | 0.8 | 0.0 | 0.6 | 0.0 | 1.1 | -- |
| Germany(*) | 0406305100 - CH,PR-G,QT | MT | 702.7 | 507.9 | 537.8 | 251.4 | 297.3 | 18 |
| Germany(*) | 0406305300 - CH,PR-G,OQ | MT | 1.7 | 0.0 | 0.0 | 0.0 | 0.0 | -- |
| Switzerland(*) | 0406305100 - CH,PR-G,QT | MT | 91.5 | 100.5 | 111.1 | 43.8 | 30.4 | -31 |
| Switzerland(*) | 0406305300 - CH,PR-G,OQ | MT | 0.8 | 0.1 | 1.0 | 1.0 | 0.0 | -- |
| Egypt | 0406305100 - CH,PR-G,QT | MT | 49.5 | 47.5 | 66.1 | 41.1 | 43.2 | 5 |
| Egypt | 0406305300 - CH,PR-G,OQ | MT | 0.0 | 0.0 | 0.0 | 0.0 | 1.6 | -- |
| France(*) | 0406305100 - CH,PR-G,QT | MT | 13.8 | 12.4 | 32.1 | 19.5 | 6.5 | -67 |
| France(*) | 0406305300 - CH,PR-G,OQ | MT | 2.6 | 5.5 | 0.0 | 0.0 | 0.2 | -- |
| Czech Republic | 0406305100 - CH,PR-G,QT | MT | 18.6 | 19.5 | 29.4 | 9.8 | 36.8 | 276 |
| Italy(*) | 0406305300 - CH,PR-G,OQ | MT | 8.1 | 6.6 | 0.0 | 0.0 | 0.0 | -- |
| Grand Total | | MT | 2,017.9 | 2,261.8 | 2,583.3 | 1,431.3 | 1,225.4 | -14 |

| UOM | Conv. Factor | Name | Edit |
|---|---|---|---|
| MT | | | Edit |
| | Convert | Clear / Reset | |

**Notes:**
1. Data Source: U.S. Census Bureau Trade Data
2. All zeroes for a data item may show that statistics exist in the other import type. Consumption or General.
3. (*) denotes a country that is a summarization of its component countries.
4. Users should use cautious interpretation on QUANTITY reports using mixed units of measure. QUANTITY line items will only include statistics on the units of measure that are equal to, or are able to be converted to, the assigned unit of measure of the grouped commodities.
5. Product Group : Harmonized

Witness Testimony

● Mr. Gellert testified that Atalanta imports and sells a cheese labeled "gruyere" cheese sourced in Austria (Austrian Alps brand) and in Germany (Ammerland brand).[99]

● Mr. Jaeckle testified that his business cuts and packs Emmi Roth and Boar's Head cheese; that the only source of Wisconsin gruyere is Emmi Roth; and there are other smaller producers of a cheese referred to as "gruyere" in the United States.[100] He also testified that some cheese referred to as "gruyere"

---

skim spiced cheese, and skim milk cheese for manufacturing with an emulsifying agent prescribed by paragraph (c) of this section into a homogeneous plastic mass." 21 C.F.R. § 133.169(e)(2)(i) states, "In case it is made from gruyere cheese and swiss cheese, and the weight of gruyere cheese is not less than 25 percent of the weight of both, it may be designated 'Pasteurized process gruyere cheese.'"

[99] Gellert Depo. at pp. 14-15, 31 TTABVUE 16-17.

[100] Jaeckle Depo. at p. 36, 32 TTABVUE 38.

is sold as Grand Cru cheese but some is packed under private labels bearing the name "gruyere."[101] Exh. 66 to his testimony deposition reflects a webpage from http://boarshead.com with the heading "Blanc Grue TM Gruyere Cheese Boar's Head" which states that the cheese is made from milk from small family farms in Wisconsin.[102]

Emmi Roth

The record reflects that in 1990, Mr. Jaeckle and other investors founded Roth Kase USA, Inc., the predecessor to Emmi Roth. Roth Kase first produced cheese labeled as "gruyere" made in the United States in 1991; its "flagship product" and "primary focus of the business" was cheese produced in the U.S. called "Grandcru Gruyere." Roth Kase grew to an 80 million dollar business and Emmi Roth USA, Inc. purchased the business in 2009. In 2009, at the time of the sale, Roth Kase was "doing in excess of 2 million pounds of Gruyere cheese."[103]

In 2012, Emmi AG, which Applicants identify as the parent company of Emmi Roth,[104] entered into an agreement with IDG in which it agreed not to label cheese under its own brand as "gruyere."[105] The 2012 agreement states that Emmi AG "will provide its customers with all necessary information" concerning the GRUYÈRE certification mark, but will not "play[ ] a control or inspection role" and "[a]ny use of

---

[101] Mr. Jaeckle testified that in 2009 Emmi Roth produced in excess of 2 million pounds of gruyere, but he did not testify how this gruyere was labeled. *Id*. at p. 38, 32 TTABVUE 40.

[102] Jaeckle Depo. Exh. 66, 32 TTABVUE 146-47.

[103] Jaeckle Depo. at pp. 10-11, 32 TTABVUE 12-13.

[104] Applicants' brief at p. 25, 47 TTABVUE 27.

[105] Opposers' brief, Exh. B (English translation), 43 TTABVUE 39.

Gruyère as a brand name by [Emmi Roth's] customers, in the context of 'private labels' or gastronomy, would not be [Emmi Roth's] responsibility."[106]

Exhibit C, submitted with Emmi Roth's discovery responses and discussed previously in this opinion, indicates that in 2012 and 2013, Emmi Roth produced millions of pounds of "Domestic Roth branded Gruyere" and "Domestic Private-Label branded Gruyere";[107] and in the period 2014-2016, Emmi Roth produced no "Domestic Roth branded Gruyere" but continued to produce millions of pounds of "Domestic Private-Label branded Gruyere."

Opposers find Applicants' actions significant because (i) Emmi Roth's production of a cheese referred to as "gruyere" is "massive" and greater than all of the GRUYÈRE produced in Switzerland by SIG annually;[108] (ii) in letters to producers and sellers of American-made cheese referred to as "gruyere", IDG emphasized that Emmi Roth ceased use of the term "gruyere" to describe U.S.-made cheese;[109] and (iii) Emmi Roth has not barred resellers of its U.S.-made cheese from labeling such cheese as "gruyere."[110]

---

[106] *Id.* The certification mark referred to in the agreement is the LE GRUYÈRE SWITZERLAND AOC and design mark of Reg. No. 4398395. As noted above, the involved application was filed on September 17, 2015, after the date of the agreement.

[107] The figures in Exhibit C have been designated confidential so we do not disclose them. We identify, instead, the production figures Applicants disclosed in their brief. Applicants' brief at p. 27, 47 TTABVUE 29.

[108] Opposers' Corrected Notice of Reliance Exh. 1, 41 TTABVUE 5.

[109] *Id.* at Exhs. 117-143, 40 TTABVUE 99-229. Exh. 118, 40 TTABVUE 103, a demand letter to Swiss-American, Inc. authored by Applicants' counsel states, "Further, Emmi Roth USA, previously the largest producer and importer of Swiss cheese in the U.S., has acted in accordance with this decision [to cease using of the term "gruyere" to describe U.S.-made gruyere] and has ceased all use of the designation Gruyere on its American-produced cheese."

[110] Opposers brief at pp. 22-23, 42 TTABVUE 24-25.

WCMA Cheese Competition

Opposers submitted a pamphlet and magazine pages showing a list of winners in the "gruyere" or "gruyere style" category for the World Championship Cheese Contest in 1995, 1998-2000, 2002, 2004-08, and 2010-2016 as an exhibit to Mr. Umhoefer's declaration.[111] The record also contains webpage printouts from http://wccc.myentries.org of competition winners for 2010, 2012, 2014, 2016 and 2018.[112]

Opposers have not described the competition, but Applicants' declarant, Mr. Bardet, states that the Wisconsin Cheese Makers Association runs the World Championship Cheese Contest every two years, and that the competition includes categories of cheese.[113] He adds that a competition was conducted in 2018 and that one category in the 2018 competition was called "Gruyere" for cheeses sold under the name GRUYÈRE; and that:

> All but one of the cheeses in this category are produced in Switzerland and are entitled to use the GRUYÈRE certification mark. The one exception is a cheese made in Denmark by a producer named Bornholms Andelsmejeri. Opposers have not submitted any evidence that this Danish cheese is even sold in the United States, and we have not seen any evidence that it is sold in the U.S. In short, among the hundreds of entrants in the World

---

[111] Opposers' Corrected Notice of Reliance Exh. 147-57, 40 TTABVUE 279-308.

[112] Umhoefer's Decl. Exh B, 20 TTABVUE 17-48; Opposers' Notice of Reliance Exhs. 74 – 78, 28 TTABVUE 245-53; Opposers' Corrected Notice of Reliance Exhs. 148-157, 40 TTABVUE 276-311. Opposers objected to these exhibits on the basis of hearsay but, of course, we do not rely on this material for the truth of their assertions but only for public exposure to what is contained therein, which includes listings of non-Swiss or French producers of gruyere. *See Safer*, 94 USPQ2d at 1039. The probative value of this material suffers because there is no indication of who has access to the publications listing the winners.

[113] Bardet Decl. ¶ 28, 37 TTABVUE 10-11.

Championship Cheese Contest, no cheese made in the U.S. uses the name Gruyère, and, with one minor exception, all the cheeses that use the name GRUYÈRE are made in Switzerland.[114]

Opposers note that non-Swiss and non-French producers are listed as winners along with Swiss or French winners in the same categories of cheese referred to as "gruyere" for each year for which there is evidence.

### ii. Evidence Relied on by Applicants

Dictionary definitions and reference materials[115]

- Merriam-Webster online dictionary

  a firm cheese with small holes and nutty flavor that is of Swiss origin.[116]

- Free Dictionary

  A kind of cheese made at Gruyère, Switzerland.[117]

- Wikipedia

  a hard yellow cheese, named after the town of Gruyères in Switzerland, and originated in the cantons of Fribourg, Vaud, Neuchatel, Jura and Berne. Before 2001, when Gruyère gained Appellation d'Origine Contrôlée (AOC) status as a Swiss cheese, some controversy existed

---

[114] *Id.*; Opposers' Notice of Reliance Exhs. 77-78, 28 TTABVUE 250-53.

[115] Applicants request that we take judicial notice of a definition of "gruyère" from Encyclopedia Britannica. Applicants' brief at p. 37, 47 TTABVUE 39. Because Applicants did not submit a copy of the webpage containing the Encyclopedia Britannica entry but only provided the web address, we deny Applicants' request. We do, however, take judicial notice of the following definition of "Gruyère Cheese" located at https://www.britannica.com/topic/Gruyere (accessed on August 4, 2020); "Gruyère, hard cow's-milk cheese produced in the vicinity of La Gruyère in southern Switzerland and in the Alpine Comté and Savoie regions of eastern France." The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), including online dictionaries that exist in printed format or regular fixed editions. *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006).

[116] Opposers' Notice of Reliance Exh. 68, 28 TTABVUE 80.

[117] *Id.*

whether French cheeses of a similar nature could also be labeled Gruyère (French Gruyère style cheeses include Comté and Beaufort).[118]

● The Oxford Companion To Cheese (Oxford University Press, 2016)

Stating "Gruyère is an appellation de contrôlée (AOP) cheese from Switzerland"[119] the best of which "are widely considered among the greatest of all cheeses"; "'Cheddar' has become a generic term encompassing a vast range of hard cheeses. . . Cheddar is all things to all people";[120] and "Swiss cheese is the American-born generic term for a category of cheeses, manufactured and sold primarily in the United States …."[121]

Applicants' Publicity/Educational Efforts

Mr. Bardet, IDG's Director, states that; (i) he regularly visits two professional international trade fairs in the United States, The Specialty Food Association's Winter and Summer Fancy Food Shows, where he meets retailers, distributors, and members of the food service industry and that except for GRUYÈRE cheese from Switzerland, no exhibitor at either show offers cheese under the Gruyère name; (ii) he regularly visits retail stores that sell GRUYÈRE cheese in the U.S., where he speaks to retailers and consumers;[122] (iii) IDG works closely with radio stations in such cities as New York, San Francisco, Philadelphia, Boston and Miami, where IDG has co-sponsored talks about recipes featuring GRUYÈRE cheese; and (iv) IDG has co-sponsored videos on the "Saveur" magazine website, including one in which a well-

---

[118] *Id.*

[119] Applicants' Notice of Reliance Exh.11, 35 TTABVUE 10.

[120] *Id.*, 35 TTABVUE 9.

[121] *Id.*, 35 TTABVUE 13.

[122] Bardet Decl. ¶ 13, 37 TTABVUE 6.

known chef prepares a dish using GRUYÈRE cheese, and the GRUYÈRE product is prominently seen in the video.[123]

<u>Applicants' policing efforts to limit retailers' use of "gruyere"</u>

Mr. Bardet states that IDG's attorneys have conducted a letter-writing campaign to sellers of non-Swiss or French cheese referred to as "gruyere" and to those who label cheese as "gruyere" in the U.S. He submitted letters from Applicants' counsel to 21 retailers including Whole Foods and Ralph's Supermarkets requesting that they cease their use of the term "gruyere" for their private label cheese.[124] Most of the letters are dated in the 2016–2017 time period. In those letters, Applicants' counsel suggests using terms such as "Swiss-style"[125] or "Alpine Style Cheese"[126] or "Swiss cheese" or "Swiss-style cheese"[127] to describe cheese referred to as "gruyere." Mr. Bardet states that not every retailer has complied with IDG's demands; that IDG has a limited budget for its enforcement and litigation efforts; and that IDG will revisit the issue of whether to commence litigation against these retailers if it prevails in this Opposition.[128]

In addition, Applicants mention that IDG's lawyers wrote to the Wisconsin Milk Marketing Board requesting that "gruyere" not be used as the name for a cheese made

---

[123] *Id*. at ¶ 16, 37 TTABVUE 7.

[124] *Id*. at ¶ 26, 37 TTABVUE 9.

[125] *Id*. at ¶ 18, 37 TTABVUE 8; *Id*., Exh. 6, 37 TTABVUE 50.

[126] *Id*., 37 TTABVUE 104.

[127] *Id*., 37 TTABVUE 115.

[128] *Id*. at ¶ 27, 37 TTABVUE 9.

in Wisconsin;[129] that the Wisconsin Milk Marketing Board revised its website and no longer uses "gruyere" as the name for a cheese made in Wisconsin;[130] and that the Ammerland Dairy Company in Germany changed the name of its cheese from "Ammerlander Gruyère" to "Ammerlander Alpine," and this name is now used in the United States.[131]

Emmi Roth

Applicants point out that IDG successfully stopped Emmi Roth, "the largest and only significant U.S. producer" of "domestic Gruyère" from using the term "gruyere" on cheese sold under its own label and that it now uses GRAND CRU ORIGINAL, GRAND CRU RESERVE, and GRAND CRU SURCHOIX as the names for the cheeses it formerly called "domestic Gruyère."[132] With regard to Exhibit C to Mr. Kunz's Declaration, the spreadsheet, Applicants state that it says nothing about how "the cheese was labelled when it was sold by retailers to consumers [and] Opposers have no evidence to show how many pounds of 'private label' U.S.-made cheese were sold to consumers bearing labels bearing the term 'gruyere,' as opposed to other terms, such as 'Alpine-Style cheese,' 'Mountain-Style cheese,' or some other term."[133] Mr. Bardet admits, however, that Emmi Roth "continues to sell cheese in bulk to

---

[129] *Id.*, Exh. 6, 37 TTABVUE 61-62.

[130] Applicants' Notice of Reliance Exh. 16, 35 TTABVUE 31, referring to "Alpine Style" cheese.

[131] Bardet Decl. ¶ 25, 37 TTABVUE 9; Applicants' Notice of Reliance Exh. 18, 35 TTABVUE 35 ("This all natural cheese is a German take on the classic alpine Gruyere") and Exh. 5, 37 TTABVUE 268.

[132] Bardet Decl. at ¶ 17, 37 TTABVUE 7-8; Applicants' Notice of Reliance Exh. 15, 35 TTABVUE 29.

[133] Applicants' brief at pp. 27-28, 47 TTABVUE 29-30.

retailers and distributors, some of whom continue to label the cheese as 'Gruyère' ...."[134]

## VI. Analysis

In evaluating the parties' evidence, we begin with the reference materials in the record including the dictionary definitions. In general, the dictionary entries for the term "gruyere" submitted by Opposers are not restricted to a cheese produced in France or Switzerland or even originating in France or Switzerland. The dictionary evidence relied on by Applicants mentions that the cheese originated in Switzerland or is named after a place in Switzerland, but does not limit the definition of "gruyere" to cheese produced in France or Switzerland. The Oxford Companion To Cheese, submitted by Applicants, states that GRUYERE is an AOC for cheese from Switzerland; it does not mention France. The Cheese Lover's Companion contains an entry for "Gruyère (AOC)" but states, "[i]n America, Roth Käse USA Ltd., of Monroe, Wisconsin, makes an award-winning version called Grand Cru Gruyere. ... They produce three versions of Gruyere ...."[135] We find that the reference materials describe a category of cheese that may be made anywhere and evoke the Swiss and (occasionally) French origin of the cheese. *Cf. Tea Bd. of India v. Republic of Tea Inc.*, 80 USPQ2d 1881, 1895 (TTAB 2006) ("a number of the dictionaries reference Darjeeling as the exclusive geographic source of tea from that region.").

---

[134] Bardet Decl. at ¶ 30, 37 TTABVUE 11-12.

[135] Opposers' Notice of Reliance Exh. 106, 28 TTABVUE 833.

The record demonstrates that cheese identified as "gruyere" is made in many locations including Germany, Austria and the United States. Those knowledgeable of the World Championship Cheese Contest will know that non-Swiss and non-French producers of cheese (along with Swiss or French producers) are listed as winners in "gruyere" categories for each year for which there is evidence. In the United States, Emmi Roth (and its predecessor company Roth Kase) has been the largest producer of cheese labeled as "gruyere" for many years, with an annual production of millions of pounds. Other smaller producers of cheese labeled as gruyere exist in the United States.[136]

In 2012, Emmi Roth ceased labeling its American-produced cheese with the term "gruyere," but did not cease the production and sale of the cheese itself. Emmi Roth's discovery response indicates that it continues to produce millions of pounds per year of "Domestic Private-Label branded Gruyere."[137] Applicants argue that Exhibit C to Mr. Kunz's Declaration says nothing about how "the cheese was labelled when it was sold by retailers to consumers [and] Opposers have no evidence to show how many pounds of 'private label' U.S.-made cheese were sold to consumers bearing labels bearing the term 'gruyere,' as opposed to other terms, such as 'Alpine-Style cheese,' 'Mountain-Style cheese,' or some other term."[138] Mr. Jaeckle testified, however, that Emmi Roth produces cheese labeled as gruyere for Boars Head[139] and Mr. Bardet

---

[136] Jaeckle Depo. at p. 41, 32 TTABVUE 43.

[137] Kunz Decl. ¶ 5, 22 TTABVUE 6; Kunz Decl. Exh. C, 22 TTABVUE 26.

[138] Applicants' brief at pp. 27-28, 47 TTABVUE 29-30.

[139] Jaeckle Depo. at pp. 40-41, 32 TTABVUE 42-43.

corroborated Mr. Jaeckle's testimony, stating "Roth Cheese continues to sell cheese in bulk to retailers and distributors, some of whom continue to label the cheese as "Gruyère."[140] Mr. Gellert identified the major retailers of cheese labeled as "gruyere" as "[e]very major retailer that you can imagine, Trader Joes, Costco, Wegmans, … Publix, every major retailer. Sometimes you see them marketing under brands, their own brands, manufacturer brands, sometimes under a group like Boars Head that has their own brand often in retail."[141] The evidence reflects that major retailers continue to sell Boar's Head cheese labeled as "gruyere" produced by Emmi Roth in the United States.[142]

In addition to Emmi Roth and the smaller producers of cheese labeled as "gruyere" in the United States, there are non-Swiss and non-French foreign producers of cheese labeled as "gruyere" that is sold in the United States. Mr. Gellert testified that Opposer Atalanta imports and sells cheese labeled as "gruyere" sourced in Austria (Austrian Alps brand), and Mr. Bardet acknowledged the same in his testimony.[143] Mr. Gellert also stated that he has imported and sold cheese labeled as "gruyere" from Ammerlander, a German company.[144] The statistics from the U.S. Department of

---

[140] Bardet Decl. at ¶ 30, 37 TTABVUE 11-12.

[141] Gellert Depo. at p. 27, 31 TTABVUE 29.

[142] Jaeckle Depo. at 34, 39-41, 32 TTABVUE 36, 41-43; Jaeckle Depo. Exh. 66, 36 TTABVUE 145-47. Opposers' Second Notice of Reliance Exh. 161, 39 TTABVUE 7.

[143] Bardet Decl. ¶ 30, 37 TTABVUE 11.

[144] Gellert Depo. at pp. 15-16, 31 TTABVUE 17-18. Applicants maintain that Ammerlander no longer uses the term "gruyere" and cite to Mr. Bardet's statement at Paragraph 25 of his declaration (37 TTABVUE 9) where he refers to a webpage printout from iGourmet.com ("Specialty Cheeses • Fine Foods • Exquisite Gifts") which states "Ammerlander Alpine[.] This all natural cheese is a German take on the classic alpine Gruyere." Applicants' Notice of Reliance Exh. 18, 35 TTABVUE 35. We do not entirely discount Mr. Gellert's testimony

Agriculture reflect that between 1,000 – 2,000 metric tons of processed cheese labeled as "gruyere" is imported into the United States[145] and other evidence reflects that processed cheese is offered for sale as "gruyere" in the United States. *See* label for Red Apple Cheese reproduced above showing processed cheese labeled as "Gruyere Cheese."[146]

As noted above, Applicants have conducted a letter-writing campaign requesting various retailers to cease using the term "gruyere" in connection with labels for cheese not sourced in Switzerland or France.[147] Opposer Atalanta received such a letter in 2012. Applicants sent four additional letters in 2014; the remainder are of more recent vintage from 2016-2017, about when Opposers commenced this proceeding. Mr. Bardet identified 21 retailers that have stopped using "Gruyère" for their private label cheese as a result of these letters."[148] Applicants have not identified the volume or market share of non-Swiss and non-French cheese privately labeled as "gruyere" these retailers commanded. One major retailer, Trader Joes, to whom Applicants' counsel sent a cease and desist letter, is notably absent from this group of retailers

---

based on Mr. Bardet's statement, which appears to rely on a webpage from an internet cheese merchant. If Ammerlander did stop using the term "gruyere" for its cheese, there is no indication when it ceased such use.

[145] Opposers' Notice of Reliance Exh. 92, 28 TTABVUE 674.

[146] https://www.redapplecheese.com/products/apple-smoked-cheese, Opposers' Second Notice of Reliance Exh. 164, 39 TTABVUE 16.

[147] There is no indication in the record or Applicants' brief as to why Applicants chose to send letters to these retailers and not to others.

[148] Bardet Decl. at ¶ 27, 37 TTABVUE 10.

that have stopped selling non-Swiss and non-French cheese privately labeled as "gruyere."[149] While Applicants' counsel sent the following entities letters,

- Frank Brunckhorst[150]
- Dairyfood USA, Inc.[151]

- Finlandia[152]
- Foodworks/Food Distributors, Inc.[153]

- InterSource, Inc.[154]
- Mandi Foods, Inc.[155]

- Ralph's Supermarkets[156]
- Red Apple[157]

- Trader Joe's Company[158]
- Atalanta[159]

---

[149] Opposers' Notice of Reliance Exh. 140, 28 TTABVUE 220-21.

[150] Opposers' Second Notice of Reliance Exh. 162, 39 TTABVUE 10 ("BLANC GRUE GRUYERE CHEESE"); Opposers' Corrected Notice of Reliance Exh. 129, 40 TTABVUE 162.

[151] *Id.* at Exh. 120, 40 TTABVUE 114.

[152] *Id.* at Exh. 126, 40 TTABVUE 149.

[153] *Id.* at Exh. 128, 40 TTABVUE 158.

[154] *Id.* at Exh. 130, 40 TTABVUE 166.

[155] Opposers' Second Notice of Reliance Exh. 163, 39 TTABVUE 13; Opposers' Corrected Notice of Reliance Exh. 133, 40 TTABVUE 179. Mr. Bardet states in his declaration (37 TTABVUE 9) that Mandi Foods, Inc. has stopped using "Gruyere" for its private label cheese but Opposers' evidence, dated after Mr. Bardet's declaration, demonstrates that Mandi continues to offer non-Swiss or non-French cheese labeled as "gruyere.'

[156] Opposers' Second Notice of Reliance Exh. 161, 39 TTABVUE 7. Mr. Bardet states in his declaration (37 TTABVUE 9) that Ralph's Supermarkets has stopped using "Gruyere" for its private label cheese. An email dated January 23, 2017 from Sam E. Iverson of Pillsbury Winthrop Shaw Pittman LLP states, "We write in response to your letter … to Ralphs Grocery Company, attached. While we do not concede your claims, Ralphs is in the process of changing its product labeling and signage to remove the word GRUYERE from domestic cheese, as requested …. We trust that this will resolve the matter." Bardet Decl. Exh. 6, 37 TTABVUE 173. Opposers' evidence, dated after Mr. Bardet's Declaration, demonstrates that Ralph's continues to offer non-Swiss or non-French cheese labeled as "gruyere."

[157] Opposers' Second Notice of Reliance Exh. 164, 39 TTABVUE 16; Opposers' Corrected Notice of Reliance Exh. 119, 40 TTABVUE 111.

[158] *Id.* at Exh. 140, 40 TTABVUE 220.

[159] Gellert Depo. at pp. 22-24, 31 TTABVUE 24-25.

there is no uncontroverted evidence establishing that they have stopped using the term "gruyere" in connection with non-Swiss or non-French cheese. Opposers' website evidence — particularly that submitted with its Second Notice of Reliance — depicts non-Swiss and non-French cheese labeled as "gruyere" offered for sale in the United States: Red Apple Gruyere, Boar's Head Gruyere Cheese, Murry's Gruyere, Boar's Head Smoked Gruyere Cheese, Murray's Cave Aged Gruyere and Boar's Head Hickory Smoked Gruyere Cheese.[160] Thus, while Applicants may have had some success with certain retailers, there is ample evidence that many others exist and continue to sell non-Swiss and non-French cheese labeled as "gruyere" in the United States. The fact that some have changed the names of their products or removed the term "gruyere" from marketing materials or a webpage fails to persuade us that the public in the United States would not primarily understand "gruyere" to refer to a type of cheese regardless of its country of origin or any particular certification standards. *See In re Hikari Sales USA, Inc.*, 2019 USPQ2d 111514, at *9-10 (TTAB 2019) ("Also, the fact that some of these competitors changed the names of their products or removed the term from marketing materials or a webpage does not convince us that the term functions as Applicants' trademark or that the public would not primarily understand 'Algae Wafers' to refer to a type of fish food.") (citing *In re Wella Corp.*, 565 F.2d 143, 196 USPQ 7, 8 n.2 (CCPA 1977) (evidence that competitors may have agreed to discontinue use of a term upon threat of legal action shows a desire by those competitors to avoid litigation, rather than distinctiveness of the

---

[160] Opposers' Second Notice of Reliance Exh. 161, 39 TTABVUE 7.

term); *In re Volvo White Truck Corp.*, 16 USPQ2d 1417, 1421 (TTAB 1990) (recognizing that competitors may stop using a term to avoid a costly lawsuit rather than because they recognize the term as a trademark, particularly if there were other terms which they could use); *In re Consolidated Cigar*, 13 USPQ2d at 1483 (finding similar evidence of competitor use probative and finding evidence that three out of four competitors agreed to discontinue use as showing merely a desire to avoid litigation rather than acknowledgement of distinctiveness of the term "whiffs")).

We turn now to the media and Internet references to "gruyere." We find that the uses of "gruyere," "gruyere cheese" and "Wisconsin gruyere" reflect use of "gruyere" to identify a category of cheese that can come from anywhere and are not persuaded by Applicants' arguments to the contrary.[161] Specifically, Applicants argue that the media references are brief "snippets" and have little value, citing a non-precedential Board decision[162] involving a refusal under Section 2(d) of the Trademark Act, 15

---

[161] Opposers' Notice of Reliance, Exhs. 89-90, 28 TTABVUE 583-673; "Letter of Protest Memorandum," May 10, 2016 TSDR. The "Letter of Protest Memorandum" is automatically part of the record in this proceeding as it forms a part of the prosecution file for Applicants' application. *See* Trademark Rule 2.122(b).

Applicants have objected to Exhibits 89-90 on the basis of hearsay. We do not consider the substance of the media and Internet references to "gruyere" for the truth of any assertion therein but rather as evidence of public exposure to use of the term generically. Applicants' hearsay objection is therefore moot.

[162] Although parties are permitted to cite to any Board decision, citation to non-precedential decisions is not encouraged and such decisions are not binding on the Board. *See In re Soc'y of Health & Physical Educators*, 127 USPQ2d 1584, 1587 n.7 (TTAB 2018) ("Board decisions which are not designated as precedent are not binding on the Board, but may be cited and considered for whatever persuasive value they may hold."); *In re Morrison & Foerster LLP*, 110 USPQ2d 1423, 1427, n.6 (TTAB 2014) ("Although parties may cite to non-precedential decisions, the Board does not encourage the practice."); *In re Luxuria s.r.o.*, 100 USPQ2d 1146, 1151 n.7 (TTAB 2011) (parties may cite to non-precedential decisions, but they are not binding on the Board and because they have no precedential effect, the Board generally will not discuss them in other decisions).

U.S.C. § 1052(d), discussing Google search result summaries.[163] The excerpts are not search engine results and they provide sufficient text and context for us to evaluate how consumers would perceive the uses of the term "gruyere." Applicants also maintain that references to "gruyere" in lower case letters does not necessarily mean that "genuine" gruyere cheese is not discussed or called for such as in recipes.[164] We find that the uses of "gruyere" without capitalization are references to a type of cheese of any geographic origin, including cheeses not made in Switzerland or France, and hence evidence use of "gruyere" to identify a type of cheese. *See Hikari Sales USA*, 2019 USPQ2d 111514 at *9 ("The Google search results showing use of "algae wafers" by consumers on website forums have sufficient context and reflect generic use of the term as they are in lower case letters and are used to reference fish food generally."); *Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC,* 124 USPQ2d 1184, 1190, 1193 (TTAB 2017) (lower case references to "pretzel crisps" with no apparent reference to the term as a brand or to the applicant indicate an understanding by the relevant public that the term refers to a genus of a product rather than a single producer); *Tea Bd. of India*, 80 USPQ2d at 1896 ("Applicant has not pointed to, nor have we seen, a single instance of use of Darjeeling in a lower case letter 'D' which may signify use in the manner of a generic designation."); *Cooperative Produttori Latte E Fontina Valle D'Aosta*, 230 USPQ at 134 ("Rather, the lower-case treatment of this word by the references to name a kind of cheese with certain hardness, texture and flavor

---

[163] Applicants' brief at p. 39, 47 TTABVUE 41.

[164] *Id.*

characteristics, and the fact that the record reveals that there is a domestic fontina cheese demonstrates to us that, to the American purchaser, 'fontina' primarily signifies a type of cheese (much like brie, swiss, parmesan or mozzarella) regardless of regional origin, rather than a mark of certification.").[165] *Cf. Zimmerman v. Nat'l. Assoc. of Realtors*, 70 USPQ2d 1425, 1434 (TTAB 2004) ("'Realtor' is capitalized and used in a manner consistent with respondent's position that this term functions as an identifier for its members, not as a generic designation for all real estate agents"). In addition, Applicants' challenge to the probity of the recipes because they do not recite the geographic origin of "gruyere" is not well-taken. *See Luxco,* 121 USPQ2d at 1490 ("there is no evidence that recipes typically recite the geographic origin of the ingredients comprising the recipe.").

Applicants also suggest that some of Opposers' evidence is "old," mentioning, inter alia, Exhibit 93 to Opposers' Notice of Reliance, which bears a 2016 date.[166] We find that Opposers' evidence, including the excerpts from media stories dating back to 2010, have probative value on the question of genericness. *See In re Trek 2000 Int'l. Ltd.*, 97 USPQ2d 1106 (TTAB 2010) (noting a lack of evidence that competitors had used THUMBDRIVE generically over ten years). Applicants would have us find that their recent efforts, including the letter-writing campaign and attempts to directly

---

[165] The record is silent as to whether Applicants sought to inform the media of their preferences on media uses of the term "gruyere."

[166] Opposers' Notice of Reliance Exh. 93, 28 TTABVUE 682-92.

educate the consuming public,[167] have changed consumer understanding of the term "gruyere" as a category of cheese that can come from anywhere in just a few years, with little direct education of the consuming public. Without evidence, we are not persuaded that such a limited campaign could change consumer perception so quickly.[168] Further, it was not until 2011 when the European Union recognized the Protected Designation of Origin, and it was not until 2012 when the French National Institute of Origin and Quality approved GRUYÈRE as a "protected geographical indication" for a limited area in France.[169]

We next turn to 21 C.F.R. § 133.149, the FDA standard of identity for "gruyere cheese," which identifies the ingredients and the production standards for any cheese labeled as a "gruyere cheese" but does not limit the cheese to a particular geographic source. The standard states that "the name of the food is 'gruyere cheese.'" Applicants argue that Opposers have presented "no evidence that the public is aware of the text of this FDA regulation, and thus the regulation could not have any impact on the public's understanding of the mark GRUYÈRE."[170]

Section 133.10 of 21 C.F.R., of which 21 C.F.R. § 133.149 is a subsection, is titled "Notice to manufacturers, packers, and distributors of pasteurized blended cheese,

---

[167] In this regard, we note Mr. Bardet's testimony concerning, inter alia, his visits to retail stores that sell GRUYÉRE cheese, his talks to retailers and consumers and IDG-sponsored talks about recipes featuring GRUYÉRE cheese. Bardet Decl. ¶¶ 13-16, 37 TTABVUE 6-7.

[168] *Cf. Royal Crown*, 127 USPQ2d at 1049, concerning a survey taken more than five years prior to trial as evidence of acquired distinctiveness (but not genericness).

[169] Lehmann Decl. ¶ 17, 36 TTABVUE 27; Guittard Decl. ¶ 6, 36 TTABVUE 3.

[170] Applicants' brief at 32, 47 TTABVUE 34.

pasteurized process cheese, cheese food, cheese spread, and related foods" and states

in relevant part as follows:

> (a) Definitions and standards of identity have recently been promulgated under the authority of the Federal Food, Drug, and Cosmetic Act for a number of foods made in part from cheese, including pasteurized process cheese; pasteurized process cheese with fruits, vegetables, or meats; pasteurized blended cheese; pasteurized process cheese food; pasteurized process cheese spread, and related foods. **These standards prescribe the name for each such food. The act requires that this name appear on the label.** … (emphasis added.)

Sections 133.10 and 133.149 are probative on the question of genericness of the

term "gruyere" because they inform manufacturers, packers, and distributors of the

name to be placed on labels for cheeses having certain characteristics. They explain

when and under what circumstances cheese for sale in the United States, especially

cheese produced domestically, may be labeled "gruyere" and offered as such to the

purchasing public. While we agree with Applicants that the ultimate consumers of

cheese likely do not know of these regulations, consumers are affected by the

regulations because they govern the labels that consumers see in stores, advertising

and on webpages. Case law recognizes that administrative regulations have a bearing

on the question of genericness. *See Institut National Des Appellations D'Origine v.*

*Vintners Int'l Co.*, 958 F.2d 1574, 22 USPQ2d 1190, 1196 (Fed. Cir. 1992) (finding the

term "chablis" generic, stating "[s]upport for this 'generic' determination is found in

… BATF regulations" and stating "[t]he BATF regulations … actually lend support

to the argument that the term is generic. The BATF regulations define 'Chablis' as a

'semi-generic' term which is a name of geographic significance and also the

designation of a class or type of wine."); *Luxco*, 121 USPQ2d at 1485 (stating that TTB regulations "are probative in determining whether a term is distinctive or generic.").

The regulations do not offer any alternative terms for "gruyere" including those terms Applicants proposed to retailers in their cease and desist letters (alpine cheese, mountain cheese). *Cf.* 21 C.F.R. § 133.184 titled "Roquefort cheese, sheep's mild blue-mold, and blue-mold cheese from sheep's milk," stating "(c) Nomenclature. The name of the food is 'roquefort cheese', or alternatively, 'sheep's milk blue-mold cheese' or 'blue-mold cheese from sheep's milk"; *Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 133 USPQ 633, 633 (2d Cir. 1962) ("The Community of Roquefort … a municipality in France, is the holder of a certification mark 'Roquefort' for cheese, which is registered in the United States Patent Office ….").[171]

Applicants maintain that the probative value of the FDA regulation is limited in view of *Pom Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 110 USPQ2d 1877, 1884 (2014), in which "the Supreme Court noted the FDA's limited 'perspective or expertise in assessing market dynamics.'"[172] The argument misses the mark because the

---

[171] Applicants state, "Indeed … the USPTO has registered ROQUEFORT as a certification mark even though 'Roquefort,' like 'Gruyere,' is subject to an FDA standard. *See* 21 C.F.R. § 133.184; *Cmty. of Roquefort v. William Faehndrich, Inc.*, 131 U.S.P.Q. 435, 436-37 (S.D.N.Y. 1961) (ROQUEFORT indicates geographic source and methods for production and manufacture associated with that region)." Applicants' brief at pp. 31-32, 47 TTABVUE 33-34. The cited standard does not compel non-French producers to use "roquefort" but offers them alternatives to use as the name of the goods. As noted, the regulation for "gruyere" does not do the same.

[172] *Id.*

regulation here has nothing to do with market dynamics; it concerns a label for a type of cheese directed to manufacturers, packers and distributors.

Applicants also point out that Opposers have not submitted a survey. Because this case does not present a situation involving a coined or arbitrary mark but rather involves the longtime name of a type of cheese, a survey is not necessary. *See Hikari Sales USA*, 2019 USPQ2d 111514 at \*11. Moreover, the evidence in the record adduced by Opposers is sufficiently persuasive that it obviates any need for a survey. *See Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 64 USPQ2d 1761, 1767 (6th Cir. 2002) ("Thus, the overwhelming evidence in this case obviates the need for [defendant] to have conducted a consumer survey.").

Applicants also argue that "[i]f the record as a whole leaves the Board in doubt as to whether the term is generic, the Board is 'constrained to resolve that doubt in favor of applicant,'" citing *In re Trek 2000 Int'l Ltd.*, 97 USPQ2d 1106 (TTAB 2010).[173] The *Trek* case was an ex parte appeal of a refusal to register, where the Board resolves reasonable doubt as to whether an applied-for mark is generic based on the record evidence in favor of the applicant "on the theory that any person who believes that he would be damaged by the registration will have an opportunity … to oppose the registration of the mark and to present evidence, usually not present in the ex parte application, to that effect." *In re Gourmet Bakers, Inc.*, 173 USPQ 565 (TTAB 1972); *see also In re DNI Holdings Ltd.*, 77 USPQ2d 1435, 1437 (TTAB 2005). Here, we have a record developed in an inter partes trial proceeding, where Opposers bear the

---

[173] *Id.* at pp. 22-23, 47 TTABVUE 24-25.

burden of proving genericness by a preponderance of the evidence. *Princeton Vanguard*, 114 USPQ2d at 1830. There is no resolution of doubt in an applicant's favor in an opposition proceeding. In any event, we have no doubt as to our determination on the question of genericness in this case.

## VII. Conclusion on Genericness

After carefully considering all of the arguments and evidence of record, we find that purchasers and consumers of cheese understand the term "gruyere" as a designation that primarily refers to a category within the genus of cheese that can come from anywhere. *Marvin Ginn*, 228 USPQ at 530.[174]

**Decision:** Opposition Nos. 91232442, 91232446 and 91232448 to the registration of Applicants' proposed mark GRUYERE are **sustained** on the ground of genericness. Opposition No. 91232427 is **dismissed** on both claims for lack of standing.

---

[174] Because Opposers have prevailed on their claim of genericness, we need not consider their claim pertaining to a lack of control.